# BROWN *v.* ILLINOIS

No. 73–6650.   Argued March 18, 1975—Decided June 26, 1975

*Robert P. Isaacson* argued the cause for petitioner *pro hac vice.* With him on the brief were *James J. Doherty* and *John T. Moran.*

*Jayne A. Carr,* Assistant Attorney General of Illinois, argued the cause for respondent. With her on the brief were *William J. Scott,* Attorney General, and *James B. Zagel,* Assistant Attorney General.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case lies at the crossroads of the Fourth and the Fifth Amendments. Petitioner was arrested without probable cause and without a warrant. He was given, in full, the warnings prescribed by *Miranda* v. *Arizona,* 384 U. S. 436 (1966). Thereafter, while in custody, he made two inculpatory statements. The issue is whether evidence of those statements was properly admitted, or should have been excluded, in petitioner's subsequent trial for murder in state court. Expressed another way, the issue is whether the statements were to be excluded

---

*Solicitor General Bork* and *Acting Assistant Attorney General Keeney* filed a memorandum for the United States as *amicus curiae.*

as the fruit of the illegal arrest, or were admissible because the giving of the *Miranda* warnings sufficiently attenuated the taint of the arrest. See *Wong Sun* v. *United States*, 371 U. S. 471 (1963). The Fourth Amendment, of course, has been held to be applicable to the States through the Fourteenth Amendment. *Mapp* v. *Ohio*, 367 U. S. 643 (1961).

## I

As petitioner Richard Brown was climbing the last of the stairs leading to the rear entrance of his Chicago apartment in the early evening of May 13, 1968, he happened to glance at the window near the door. He saw, pointed at him through the window, a revolver held by a stranger who was inside the apartment. The man said: "Don't move, you are under arrest." App. 42. Another man, also with a gun, came up behind Brown and repeated the statement that he was under arrest. It was about 7:45 p. m. The two men turned out to be Detectives William Nolan and William Lenz of the Chicago police force. It is not clear from the record exactly when they advised Brown of their identity, but it is not disputed that they broke into his apartment, searched it, and then arrested Brown, all without probable cause and without any warrant, when he arrived. They later testified that they made the arrest for the purpose of questioning Brown as part of their investigation of the murder of a man named Roger Corpus.

Corpus was murdered one week earlier, on May 6, with a .38-caliber revolver in his Chicago West Side second-floor apartment. Shortly thereafter, Detective Lenz obtained petitioner's name, among others, from Corpus' brother. Petitioner and the others were identified as acquaintances of the victim, not as suspects.[1]

---

[1] The brother, however, when asked at the trial whether any of the victim's family suggested to the police that petitioner was

On the day of petitioner's arrest, Detectives Lenz and Nolan, armed with a photograph of Brown, and another officer arrived at petitioner's apartment about 5 p. m. App. 77, 78. While the third officer covered the front entrance downstairs, the two detectives broke into Brown's apartment and searched it. *Id.*, at 86. Lenz then positioned himself near the rear door and watched through the adjacent window which opened onto the back porch. Nolan sat near the front door. He described the situation at the later suppression hearing:

> "After we were there for a while, Detective Lenz told me that somebody was coming up the back stairs. I walked out the front door through the hall and around the corner, and I stayed there behind a door leading on to the back porch. At this time I heard Detective Lenz say, 'Don't move, you are under arrest.' I looked out. I saw Mr. Brown backing away from the window. I walked up behind him, I told him he is under arrest, come back inside the apartment with us." *Id.*, at 42.

As both officers held him at gunpoint, the three entered the apartment. Brown was ordered to stand against the wall and was searched. No weapon was found. *Id.*, at 93. He was asked his name. When he denied being Richard Brown, Detective Lenz showed him the photograph, informed him that he was under arrest for the murder of Roger Corpus, *id.*, at 16, handcuffed him, *id.*, at 93, and escorted him to the squad car.

The two detectives took petitioner to the Maxwell Street police station. During the 20-minute drive Nolan again asked Brown, who then was sitting with him in the back seat of the car, whether his name was Richard Brown and whether he owned a 1966 Oldsmobile. Brown

---

possibly responsible for the victim's death, answered: "Nobody asked." App. 74.

alternately evaded these questions or answered them falsely. Tr. 74. Upon arrival at the station house Brown was placed in the second-floor central interrogation room. The room was bare, except for a table and four chairs. He was left alone, apparently without handcuffs, for some minutes while the officers obtained the file on the Corpus homicide. They returned with the file, sat down at the table, one across from Brown and the other to his left, and spread the file on the table in front of him. App. 19.

The officers warned Brown of his rights under *Miranda*.[2] *Ibid*. They then informed him that they knew of an incident that had occurred in a poolroom on May 5, when Brown, angry at having been cheated at dice, fired a shot from a revolver into the ceiling. Brown answered: "Oh, you know about that." *Id.*, at 20. Lenz informed him that a bullet had been obtained from the ceiling of the poolroom and had been taken to the crime laboratory to be compared with bullets taken from Corpus' body.[3] *Ibid*. Brown responded: "Oh, you know that, too." *Id.*, at 20–21. At this point—it was about 8:45 p. m.—Lenz asked Brown whether he wanted to talk about the Corpus homicide. Petitioner answered that he did. For the next 20 to 25 minutes Brown answered questions put to him by Nolan, as Lenz typed. *Id.*, at 21–23.

This questioning produced a two-page statement in which Brown acknowledged that he and a man named

---

[2] There is no assertion here that he did not understand those rights.

[3] It was stipulated at the trial that if expert testimony were taken, it would be to the effect that the bullet eventually was ascertained to be a "wiped bullet," that is, that its sides were "clean and therefore it was not ballistically comparable to any other bullets, specifically the bullets taken from the body of the deceased, Roger Corpus." Tr. 543.

Jimmy Claggett visited Corpus on the evening of May 5; that the three for some time sat drinking and smoking marihuana; that Claggett ordered him at gunpoint to bind Corpus' hands and feet with cord from the headphone of a stereo set; and that Claggett, using a .38-caliber revolver sold to him by Brown, shot Corpus three times through a pillow. The statement was signed by Brown. *Id.*, at 9, 38.

About 9:30 p. m. the two detectives and Brown left the station house to look for Claggett in an area of Chicago Brown knew him to frequent. They made a tour of that area but did not locate their quarry. They then went to police headquarters where they endeavored, without success, to obtain a photograph of Claggett. They resumed their search—it was now about 11 p. m.—and they finally observed Claggett crossing at an intersection. Lenz and Nolan arrested him. All four, the two detectives and the two arrested men, returned to the Maxwell Street station about 12:15 a. m. *Id.*, at 39.

Brown was again placed in the interrogation room. He was given coffee and was left alone, for the most part, until 2 a. m. when Assistant State's Attorney Crilly arrived.

Crilly, too, informed Brown of his *Miranda* rights. After a half hour's conversation, a court reporter appeared. Once again the *Miranda* warnings were given: "I read him the card." *Id.*, at 30. Crilly told him that he "was sure he would be charged with murder." *Id.*, at 32. Brown gave a second statement, providing a factual account of the murder substantially in accord with his first statement, but containing factual inaccuracies with respect to his personal background.[4] When the state-

---

[4] In response to questions from Mr. Crilly, Brown stated that he was employed at E. I. Guffman Company in Niles, Ill., and that he was a punch press operator, App. 97, whereas he later conceded

ment was completed, at about 3 a. m., Brown refused to sign it. *Id.*, at 57. An hour later he made a phone call to his mother. At 9:30 that morning, about 14 hours after his arrest, he was taken before a magistrate.

On June 20 Brown and Claggett were jointly indicted by a Cook County grand jury for Corpus' murder. Prior to trial, petitioner moved to suppress the two statements he had made. He alleged that his arrest and detention had been illegal and that the statements were taken from him in violation of his constitutional rights. After a hearing, the motion was denied. R. 46.

The case proceeded to trial. The State introduced evidence of both statements. Detective Nolan testified as to the contents of the first, App. 89–92, but the writing itself was not placed in evidence. The second statement was introduced and was read to the jury in full. Tr. 509–528. Brown was 23 at the time of the trial. *Id.*, at 543.

The jury found petitioner guilty of murder. R. 80. He was sentenced to imprisonment for not less than 15 years nor more than 30 years. *Id.*, at 83.

On appeal, the Supreme Court of Illinois affirmed the judgment of conviction. 56 Ill. 2d 312, 307 N. E. 2d 356 (1974). The court refused to accept the State's argument that Brown's arrest was lawful. "Upon review of the record, we conclude that the testimony fails to show that at the time of his apprehension there was probable cause for defendant's arrest, [and] that his arrest was, therefore, unlawful." *Id.*, at 315, 307 N. E.

---

that he worked at Arnold Schwinn Bicycle Company and had never worked at any other place. *Id.*, at 63. He also remarked in the Crilly statement that he had completed three years of high school, *id.*, at 96, whereas later he conceded that he "never went to high school." *Id.*, at 58.

2d, at 357. But it went on to hold in two signifi-
cant and unembellished sentences:

> "[W]e conclude that the giving of the *Miranda*
> warnings, in the first instance by the police officer
> and in the second by the assistant State's Attorney,
> served to break the causal connection between the
> illegal arrest and the giving of the statements, and
> that defendant's act in making the statements was
> 'sufficiently an act of free will to purge the primary
> taint of the unlawful invasion.' (*Wong Sun v. United
> States*, 371 U. S. 471, at 486.) We hold, therefore,
> that the circuit court did not err in admitting the
> statements into evidence." *Id.*, at 317, 307 N. E.
> 2d, at 358.

Aside from its reliance upon the presence of the *Miranda*
warnings, no specific aspect of the record or of the cir-
cumstances was cited by the court in support of its con-
clusion. The court, in other words, appears to have held
that the *Miranda* warnings in and of themselves broke
the causal chain so that any subsequent statement, even
one induced by the continuing effects of unconstitutional
custody, was admissible so long as, in the traditional
sense, it was voluntary and not coerced in violation of
the Fifth and Fourteenth Amendments.

Because of our concern about the implication of our
holding in *Wong Sun* v. *United States*, 371 U. S. 471
(1963), to the facts of Brown's case, we granted cer-
tiorari. 419 U. S. 894 (1974).

## II

In *Wong Sun*, the Court pronounced the principles to
be applied where the issue is whether statements and
other evidence obtained after an illegal arrest or search
should be excluded. In that case, federal agents elicited
an oral statement from defendant Toy after forcing entry

at 6 a. m. into his laundry, at the back of which he had his living quarters. The agents had followed Toy down the hall to the bedroom and there had placed him under arrest. The Court of Appeals found that there was no probable cause for the arrest. This Court concluded that that finding was "amply justified by the facts clearly shown on this record." 371 U. S., at 479. Toy's statement, which bore upon his participation in the sale of narcotics, led the agents to question another person, Johnny Yee, who actually possessed narcotics. Yee stated that heroin had been brought to him earlier by Toy and another Chinese known to him only as "Sea Dog." Under questioning, Toy said that "Sea Dog" was Wong Sun. Toy led agents to a multifamily dwelling where, he said, Wong Sun lived. Gaining admittance to the building through a bell and buzzer, the agents climbed the stairs and entered the apartment. One went into the back room and brought Wong Sun out in handcuffs. After arraignment, Wong Sun was released on his own recognizance. Several days later, he returned voluntarily to give an unsigned confession.

This Court ruled that Toy's declarations and the contraband taken from Yee were the fruits of the agents' illegal action and should not have been admitted as evidence against Toy. *Id.*, at 484-488. It held that the statement did not result from " 'an intervening independent act of a free will,' " and that it was not "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.*, at 486. With respect to Wong Sun's confession, however, the Court held that in the light of his lawful arraignment and release on his own. recognizance, and of his return voluntarily several days later to make the statement, the connection between his unlawful arrest and the statement "had 'become so attenuated as to dissipate the taint.' *Nardone* v. *United*

*States,* 308 U. S. 338, 341." *Id.,* at 491. The Court said:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." *Id.,* at 487–488.

The exclusionary rule thus was applied in *Wong Sun primarily* to protect Fourth Amendment rights. Protection of the Fifth Amendment right against self-incrimination was not the Court's paramount concern there. To the extent that the question whether Toy's statement was voluntary was considered, it was only to judge whether it "was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion." *Id.,* at 486 (emphasis added).

The Court in *Wong Sun,* as is customary, emphasized that application of the exclusionary rule on Toy's behalf protected Fourth Amendment guarantees in two respects: "in terms of deterring lawless conduct by federal officers," and by "closing the doors of the federal courts to any use of evidence unconstitutionally obtained." *Ibid.* These considerations of deterrence and of judicial integrity, by now, have become rather commonplace in the Court's cases. See, *e. g., United States* v. *Peltier, ante,* at 535–538; *United States* v. *Calandra,* 414 U. S. 338, 347 (1974); *Terry* v. *Ohio,* 392 U. S. 1, 12–13, 28–29 (1968). "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the

constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins* v. *United States,* 364 U. S. 206, 217 (1960). But "[d]espite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *United States* v. *Calandra,* 414 U. S., at 348. See also *Michigan* v. *Tucker,* 417 U. S. 433, 446–447 (1974).[5]

## III

The Illinois courts refrained from resolving the question, as apt here as it was in *Wong Sun,* whether Brown's statements were obtained by exploitation of the illegality of his arrest. They assumed that the *Miranda* warnings, by themselves, assured that the statements (verbal acts, as contrasted with physical evidence) were of sufficient free will as to purge the primary taint of the unlawful arrest. *Wong Sun,* of course, preceded *Miranda.*

This Court has described the *Miranda* warnings as a "prophylactic rule," *Michigan* v. *Payne,* 412 U. S. 47, 53 (1973), and as a "procedural safeguard," *Miranda* v. *Arizona,* 384 U. S., at 457, 478, employed to protect Fifth Amendment rights against "the compulsion inherent in custodial surroundings." *Id.,* at 458. The function of the warnings relates to the Fifth Amendment's guarantee against coerced self-incrimination, and the exclusion

---

[5] Members of the Court on occasion have indicated disenchantment with the rule. See, *e. g., Coolidge* v. *New Hampshire,* 403 U. S. 443, 490 (1971) (Harlan, J., concurring); *id.,* at 492 (BURGER, C. J., dissenting in part and concurring in part); *id.,* at 493 (Black, J., concurring and dissenting); *id.,* at 510 (WHITE, J., concurring and dissenting); *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 411 (1971) (BURGER, C. J., dissenting). Its efficacy has been subject to some dispute. *United States* v. *Calandra,* 414 U. S. 338, 348 n. 5 (1974). See *Elkins* v. *United States,* 364 U. S. 206, 218 (1960).

of a statement made in the absence of the warnings, it is said, serves to deter the taking of an incriminating statement without first informing the individual of his Fifth Amendment rights.

Although, almost 90 years ago, the Court observed that the Fifth Amendment is in "intimate relation" with the Fourth, *Boyd* v. *United States,* 116 U. S. 616, 633 (1886), the *Miranda* warnings thus far have not been regarded as a means either of remedying or deterring violations of Fourth Amendment rights. Frequently, as here, rights under the two Amendments may appear to coalesce since "the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment." *Ibid.;* see *Mapp* v. *Ohio,* 367 U. S., at 646 n. 5. The exclusionary rule, however, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without *Miranda* warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. *Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation.[6]

Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth

---

[6] The *Miranda* warnings in no way inform a person of his Fourth Amendment rights, including his right to be released from unlawful custody following an arrest made without a warrant or without probable cause.

Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." 371 U. S., at 486. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment.

If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. See *Davis* v. *Mississippi*, 394 U. S. 721, 726–727 (1969). Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings.[7] Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could

---

[7] A great majority of the commentators have taken the same position. See, *e. g.*, Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif. L. Rev. 579, 603–604 (1968); Ruffin, Out on a Limb of the Poisonous Tree: The Tainted Witness, 15 U. C. L. A. L. Rev. 32, 70 (1967); Comment, 1 Fla. St. L. Rev. 533, 539–540 (1973); Note, Admissibility of Confessions Made Subsequent to an Illegal Arrest: Wong Sun v. United States Revisited, 61 J. Crim. L. 207, 212 n. 58 (1970); Comment, Scope of Taint Under the Exclusionary Rule of the Fifth Amendment Privilege Against Self-Incrimination, 114 U. Pa. L. Rev. 570, 574 (1966). But see Comment, Voluntary Incriminating Statements Made Subsequent to an Illegal Arrest—A Proposed Modification of the Exclusionary Rule, 71 Dick. L. Rev. 573, 582–583 (1967).

be said to be reduced to "a form of words." See *Mapp* v. *Ohio,* 367 U. S., at 648.

It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the *Miranda* warnings, *alone* and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited. See *Westover* v. *United States,* 384 U. S. 436, 496–497 (1966).

While we therefore reject the *per se* rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative *per se* or "but for" rule. The petitioner himself professes not to demand so much. Tr. of Oral Arg. 12, 45, 47. The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession,[8] the presence of intervening circum-

---

[8] See *United States* v. *Owen,* 492 F. 2d 1100, 1107 (CA5), cert. denied, 419 U. S. 965 (1974); *Hale* v. *Henderson,* 485 F. 2d 266, 267–269 (CA6 1973), cert. denied, 415 U. S. 930 (1974); *United States* v. *Fallon,* 457 F. 2d 15, 19–20 (CA10 1972); *Leonard* v. *United States,* 391 F. 2d 537, 538 (CA9 1968); *Pennsylvania ex rel. Craig* v. *Maroney,* 348 F. 2d 22, 29 (CA3 1965).

stances, see *Johnson* v. *Louisiana,* 406 U. S. 356, 365 (1972), and, particularly, the purpose and flagrancy of the official misconduct [9] are all relevant. See *Wong Sun* v. *United States,* 371 U. S., at 491. The voluntariness of the statement is a threshold requirement. Cf. 18 U. S. C. § 3501. And the burden of showing admissibility rests, of course, on the prosecution.[10]

## IV

Although the Illinois courts failed to undertake the inquiry mandated by *Wong Sun* to evaluate the circumstances of this case in the light of the policy served by the exclusionary rule, the trial resulted in a record of amply sufficient detail and depth from which the determination may be made. We therefore decline the suggestion of the United States, as *amicus curiae,* see *Morales* v. *New York,* 396 U. S. 102 (1969), to remand the case for further factual findings. We conclude that the State failed to sustain the burden of showing that the evidence in question was admissible under *Wong Sun.*

Brown's first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever. In its essentials, his situation is remarkably like that of James Wah Toy in *Wong Sun.*[11] We could hold Brown's first state-

---

[9] See *United States* v. *Edmons,* 432 F. 2d 577 (CA2 1970). See also *United States ex rel. Gockley* v. *Myers,* 450 F. 2d 232, 236 (CA3 1971), cert. denied, 404 U. S. 1063 (1972); *United States* v. *Kilgen,* 445 F. 2d 287, 289 (CA5 1971).

[10] Our approach relies heavily, but not excessively, on the "learning, good sense, fairness and courage of federal trial judges." *Nardone* v. *United States,* 308 U. S. 338, 342 (1939).

[11] The situation here is thus in dramatic contrast to that of Wong Sun himself. Wong Sun's confession, which the Court held admissible, came several days after the illegality, and was preceded

ment admissible only if we overrule *Wong Sun*. We decline to do so. And the second statement was clearly the result and the fruit of the first.[12]

The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning."[13] App. 35, 43, 78, 81, 83, 88, 89, 94. The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion.

We emphasize that our holding is a limited one. We decide only that the Illinois courts were in error in assuming that the *Miranda* warnings, by themselves, under *Wong Sun* always purge the taint of an illegal arrest.

The judgment of the Supreme Court of Illinois is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

by a lawful arraignment and a release from custody on his own recognizance. 371 U. S., at 491.

[12] The fact that Brown had made one statement, believed by him to be admissible, and his cooperation with the arresting and interrogating officers in the search for Claggett, with his anticipation of leniency, bolstered the pressures for him to give the second, or at least vitiated any incentive on his part to avoid self-incrimination. Cf. *Fahy* v. *Connecticut*, 375 U. S. 85 (1963).

[13] Detective Lenz had been a member of the Chicago police force for 14 years and a detective for 12 years. App. 6. Detective Nolan had been a detective on the force for $5\frac{1}{2}$ years. *Id.*, at 87.

MR. JUSTICE WHITE, concurring in the judgment.

Insofar as the Court holds (1) that despite *Miranda* warnings the Fourth and Fourteenth Amendments require the exclusion from evidence of statements obtained as the fruit of an arrest which the arresting officers knew or should have known was without probable cause and unconstitutional, and (2) that the statements obtained in this case were in this category, I am in agreement and therefore concur in the judgment.

MR. JUSTICE POWELL, with whom MR. JUSTICE REHNQUIST joins, concurring in part.

I join the Court insofar as it holds that the *per se* rule adopted by the Illinois Supreme Court for determining the admissibility of petitioner's two statements inadequately accommodates the diverse interests underlying the Fourth Amendment exclusionary rule. I would, however, remand the case for reconsideration under the general standards articulated in the Court's opinion and elaborated herein.

## A

The issue presented in this case turns on proper application of the policies underlying the Fourth Amendment exclusionary rule, not on the Fifth Amendment or the prophylaxis added to that guarantee by *Miranda* v. *Arizona,* 384 U. S. 436 (1966).[1] The Court recognized in *Wong Sun* v. *United States,* 371 U. S. 471 (1963), that the Fourth Amendment exclusionary rule applies to statements obtained following an illegal arrest just as it does to tangible evidence seized in a similar manner

---

[1] Each of these guarantees provides an independent ground for suppression of statements and thus may make it unnecessary in many cases to conduct the inquiry mandated by *Wong Sun* v. *United States,* 371 U. S. 471 (1963).

or obtained pursuant to an otherwise illegal search and seizure. *Wong Sun* squarely rejected, however, the suggestion that the admissibility of statements so obtained should be governed by a simple "but for" test that would render inadmissible all statements given subsequent to an illegal arrest. *Id.,* at 487–488. In a similar manner, the Court today refrains from according dispositive weight to the single factor of *Miranda* warnings. I agree with each holding. Neither of the rejected extremes adequately recognizes the competing considerations involved in a determination to exclude evidence after finding that official possession of that evidence was to some degree caused by a violation of the Fourth Amendment.

On this record, I cannot conclude as readily as the Court that admission of the statements here at issue would constitute an effective overruling of *Wong Sun.* See *ante,* at 604–605. Although *Wong Sun* establishes the boundaries within which this case must be decided, the incompleteness of the record leaves me uncertain that it compels the exclusion of petitioner's statements. The statements at issue in *Wong Sun* were on the temporal extremes in relation to the illegal arrest. Cf. *Collins* v. *Beto,* 348 F. 2d 823, 832, 834–836 (CA5 1965) (Friendly, J., concurring). Toy's statement was obtained immediately after his pursuit and arrest by six agents. It appears to have been a spontaneous response to a question put to him in the frenzy of that event, and there is no indication that the agents made any attempt to inform him of his right to remain silent. Wong Sun's statement, by contrast, was not given until after he was arraigned and released on his own recognizance. Wong Sun voluntarily returned to the station a few days after the arrest for questioning. His statement was preceded by an official warning of his right

to remain silent and to have counsel if he desired.[2]   The Court rejected the Government's assertion that Toy's statement resulted from an independent act of free will sufficient to purge the consequences of the illegal arrest. Wong Sun's statement, however, was deemed admissible. Given the circumstances in which Wong Sun's statement was obtained, the Court concluded that "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.'"   371 U. S., at 491.

Like most cases in which the admissibility of statements obtained subsequent to an illegal arrest is contested, this case concerns statements more removed than that of Toy from the time and circumstances of the illegal arrest.   Petitioner made his first statement some two hours following his arrest, after he had been given *Miranda* warnings.   The Court is correct in noting that no other significant intervening event altered the relationship established between petitioner and the officers by the illegal arrest.   But the Court's conclusion that admission of this statement could be allowed only by overruling *Wong Sun* rests either on an overly restrictive interpretation of the attenuation doctrine, to which I cannot subscribe, or on its view that the arrest was made for investigatory purposes, a factual determination that I think more appropriately should have been left for decision in the first instance by the state courts.

## B

The Court's rejection in *Wong Sun* of a "but for" test, reaffirmed today, *ante,* at 603–604, recognizes that in some

---

[2] Toy gave a second statement under circumstances similar to those in Wong Sun's case. The Court did not, however, rule as to the admissibility of this statement, finding instead that it lacked corroboration and was therefore insufficient to support Toy's conviction. *Wong Sun* v. *United States,* 371 U. S., at 488–491.

circumstances strict adherence to the Fourth Amendment exclusionary rule imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes. The notion of the "dissipation of the taint" attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost. Application of the *Wong Sun* doctrine will generate fact-specific cases bearing distinct differences as well as similarities, and the question of attenuation inevitably is largely a matter of degree. The Court today identifies the general factors that the trial court must consider in making this determination. I think it appropriate, however, to attempt to articulate the possible relationships of those factors in particular, broad categories of cases.

All Fourth Amendment violations are, by constitutional definition, "unreasonable." There are, however, significant practical differences that distinguish among violations, differences that measurably assist in identifying the kinds of cases in which disqualifying the evidence is likely to serve the deterrent purposes of the exclusionary rule. Cf. *United States* v. *Calandra,* 414 U. S. 338, 347–348 (1974); *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 250 (1973) (POWELL, J., concurring). In my view, the point at which the taint can be said to have dissipated should be related, in the absence of other controlling circumstances, to the nature of that taint.

That police have not succeeded in coercing the accused's confession through willful or negligent misuse of the power of arrest does not remove the fact that they may have tried. The impermissibility of the attempt, and the extent to which such attempts can be deterred by the use of the exclusionary rule, are of primary relevance in determining whether exclusion is an appropriate rem-

edy. The basic purpose of the rule, briefly stated, is to remove possible motivations for illegal arrests. Given this purpose the notion of voluntariness has practical value in deciding whether the rule should apply to statements removed from the immediate circumstances of the illegal arrest. If an illegal arrest merely provides the occasion of initial contact between the police and the accused, and because of time or other intervening factors the accused's eventual statement is the product of his own reflection and free will, application of the exclusionary rule can serve little purpose: the police normally will not make an illegal arrest in the hope of eventually obtaining such a truly volunteered statement. In a similar manner, the role of the *Miranda* warnings in the *Wong Sun* inquiry is indirect. To the extent that they dissipate the psychological pressures of custodial interrogation, *Miranda* warnings serve to assure that the accused's decision to make a statement has been relatively unaffected by the preceding illegal arrest. Correspondingly, to the extent that the police perceive *Miranda* warnings to have this equalizing potential, their motivation to abuse the power of arrest is diminished. Bearing these considerations in mind, and recognizing that the deterrent value of the Fourth Amendment exclusionary rule is limited to certain kinds of police conduct, the following general categories can be identified.

Those most readily identifiable are on the extremes: the flagrantly abusive violation of Fourth Amendment rights, on the one hand, and "technical" Fourth Amendment violations, on the other. In my view, these extremes call for significantly different judicial responses.

I would require the clearest indication of attenuation in cases in which official conduct was flagrantly abusive of Fourth Amendment rights. If, for example, the fac-

tors relied on by the police in determining to make the arrest were so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or if the evidence clearly suggested that the arrest was effectuated as a pretext for collateral objectives, cf. *United States* v. *Robinson,* 414 U. S. 218, 237, 238 n. 2 (1973) (POWELL, J., concurring), or the physical circumstances of the arrest unnecessarily intrusive on personal privacy, I would consider the equalizing potential of *Miranda* warnings rarely sufficient to dissipate the taint. In such cases the deterrent value of the exclusionary rule is most likely to be effective, and the corresponding mandate to preserve judicial integrity, see *United States* v. *Peltier, ante,* p. 531; *Michigan* v. *Tucker,* 417 U. S. 433, 450 n. 25 (1974), most clearly demands that the fruits of official misconduct be denied. I thus would require some demonstrably effective break in the chain of events leading from the illegal arrest to the statement, such as actual consultation with counsel or the accused's presentation before a magistrate for a determination of probable cause, before the taint can be deemed removed, see *Gerstein* v. *Pugh,* 420 U. S. 103 (1975); cf. *Johnson* v. *Louisiana,* 406 U. S. 356, 365 (1972); *Parker* v. *North Carolina,* 397 U. S. 790, 796 (1970).

At the opposite end of the spectrum lie "technical" violations of Fourth Amendment rights where, for example, officers in good faith arrest an individual in reliance on a warrant later invalidated [3] or pursuant to a statute that subsequently is declared unconstitutional, see *United States* v. *Kilgen,* 445 F. 2d 287 (CA5

---

[3] I note that this resolution might have the added benefit of encouraging the police to seek a warrant whenever possible. Cf. *Gerstein* v. *Pugh,* 420 U. S. 103, 113 (1975), and sources cited therein.

1971). As we noted in *Michigan* v. *Tucker, supra,* at 447: "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right." In cases in which this underlying premise is lacking, the deterrence rationale of the exclusionary rule does not obtain, and I can see no legitimate justification for depriving the prosecution of reliable and probative evidence. Thus, with the exception of statements given in the immediate circumstances of the illegal arrest—a constraint I think is imposed by existing exclusionary-rule law—I would not require more than proof that effective *Miranda* warnings were given and that the ensuing statement was voluntary in the Fifth Amendment sense. Absent aggravating circumstances, I would consider a statement given at the station house after one has been advised of *Miranda* rights to be sufficiently removed from the immediate circumstances of the illegal arrest to justify its admission at trial.

Between these extremes lies a wide range of situations that defy ready categorization, and I will not attempt to embellish on the factors set forth in the Court's opinion other than to emphasize that the *Wong Sun* inquiry always should be conducted with the deterrent purpose of the Fourth Amendment exclusionary rule sharply in focus. See ALI Model Code of Pre-Arraignment Procedure, Art. 150, p. 54 *et seq.* and Commentary thereon, p. 375 *et seq.* (Prop. Off. Draft 1975). And, in view of the inevitably fact-specific nature of the inquiry, we must place primary reliance on the "learning, good sense, fairness and courage" of judges who must make the determination in the first instance. *Nardone* v. *United States,* 308 U. S. 338, 342 (1939). See *ante,* at 604 n. 10.

## C

On the facts of record as I view them, it is possible that the police may have believed reasonably that there was probable cause for petitioner's arrest. Although the trial court conducted hearings on petitioner's motion to suppress and received his testimony and that of the arresting officers, its inquiry focused on determining whether petitioner's statements were preceded by adequate *Miranda* warnings and were made voluntarily. The court did not inquire into the possible justification, actual or perceived, for the arrest. Indeed, numerous questions addressed to the circumstances of the arrest elicited the State's objection, which was sustained. App. 14–15. The Illinois Supreme Court's consideration of the factual basis for its ruling similarly failed to focus on these relevant issues or to rest in any meaningful sense on the factors set forth in the Court's opinion today. After determining that the officers lacked probable cause for petitioner's arrest, the Illinois court concluded simply that examination of the record persuaded it that "the giving of *Miranda* warnings . . . served to break the causal connection between the illegal arrest and the giving of the statements." 56 Ill. 2d 312, 317, 307 N. E. 2d 356, 358 (1974).

I am not able to conclude on this record that the officers arrested petitioner solely for the purpose of questioning, *ante,* at 605; see also *ante,* at 606 (WHITE, J., concurring in judgment). To be sure, there is evidence suggesting, as the Court notes, an investigatory arrest. The strongest evidence on that point is the inconclusive testimony by the arresting officers themselves. But the evidence is conflicting. Responding to questions as to what they told petitioner upon his arrest, the officers testified he was advised that the arrest was for investigation of murder. Responding to more pointed questions,

however, one of the arresting officers stated that he informed petitioner that he was being arrested for murder. See App. 16.[4]

Moreover, other evidence of record indicates that the police may well have believed that probable cause existed to think that petitioner committed the crime of which he ultimately was convicted. As the opinion of the Illinois Supreme Court reveals, petitioner had been identified as an acquaintance of the deceased, and the police had been told that petitioner was seen in the building where the deceased lived on the day of the murder. 56 Ill. 2d, at 315, 307 N. E. 2d, at 357. It is also plain that the investigation had begun to focus on petitioner. For example, the police had gone to the trouble of obtaining a bullet that petitioner had fired in an unrelated incident for the purpose of comparing it with the bullets that killed the victim. App. 20. The officers also obtained petitioner's photograph prior to seeking him out, and the circumstances of petitioner's arrest indicate that their suspicions of him were quite pronounced.

The trial court made no determination as to whether probable cause existed for petitioner's arrest.[5] The Illi-

---

[4] The majority of the statements cited by the Court are the officers' responses to questions inquiring as to what the officers *told* petitioner upon arresting him and thus are only indirectly relevant to the issue whether the officers might reasonably have thought they then had sufficient evidence to support a probable-cause determination. Moreover, as noted above, that evidence is contradictory. In only two instances during the trial did the inquiry relate more directly to whether the officers arrested petitioner for questioning. App. 83, 94. The officers' responses to those questions tend to support the Court's conclusion. In view of the weight of the contrary evidence, however, I think that the matter should be considered in the first instance by the state courts.

[5] Petitioner's motion to suppress alleged that the police lacked reasonable grounds for believing that he committed a crime. But

nois Supreme Court resolved that issue, but did not consider whether the officers might reasonably, albeit erroneously, have thought that probable cause existed. Rather than decide those matters for the first time at this level, I think it preferable to allow the state courts to reconsider the case under the general guidelines expressed in today's opinions.[6] I therefore would remand for reconsideration [7] with directions to conduct such further fac-

the testimony at the hearing focused primarily on the issue of the adequacy of the *Miranda* warnings and the voluntariness of petitioner's statements. At the close of the hearing the trial court ruled, without elaboration or findings of fact, that the statements were admissible. *Id.*, at 65. Conceivably the trial court thought that probable cause existed to support the arrest. The State argued this point unsuccessfully on appeal. Equally possible, the trial court might have determined that the probable-cause issue was a close one and that, viewing the totality of the circumstances with that fact in mind, the statement should be admitted.

[6] The Solicitor General has filed a memorandum as *amicus curiae* in which he urges the Court to remand the case for further factual hearings, cf. *Morales* v. *New York*, 396 U. S. 102 (1969). I concur in the Court's rejection of this suggestion, agreeing that the record is adequate to allow us to rule on the major issue—whether advice of *Miranda* rights constitutes a *per se* attenuation of the taint of an illegal arrest in all cases. I do not agree, however, that the record is adequate for the Court to rule, in addition, that there was insufficient attenuation of taint in this case.

[7] Petitioner's second statement, corroborative of the first, was given more than six hours after his arrest and some five hours after the initial statement. During this time petitioner—cooperating with the police—had made two trips away from the police headquarters in search of Claggett, whom he had identified as his confederate in the murder. This second statement was given to an assistant state's attorney who again had informed petitioner of his *Miranda* rights. The Court deems this statement to be the fruit of the first one and thus excludable along with it.

I also would leave the question of admissibility of this statement to the lower Illinois courts. Of course, if the first statement were ruled admissible under the general guidelines articulated in today's

tual inquiries as may be necessary to resolve the admissibility issue.

---

opinion, it would follow that the second statement also would be admissible. In any event, the question whether there was sufficient attenuation between the first and second statements to render the second admissible in spite of the inadmissibility of the first presents a factual issue which, like the factual issue underlying the possible admissibility of the first statement, has not been passed on by the state courts.