■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v UNIQUE DIVINE, Appellant. [800 NYS2d 545]—

Judgment, Supreme Court, Bronx County (Denis Boyle, J., at suppression hearing; David Stadtmauer, J., at jury trial and sentence), rendered August 28, 2003, convicting defendant of criminal possession of a forged instrument in the second degree, and sentencing him, as a second felony offender, to a term of 2½ to 5 years, affirmed.

The court properly denied defendant's suppression motion. The record supports the court's determination that defendant's statement was attenuated from his unlawful arrest (*see Brown v Illinois*, 422 US 590, 602-604 [1975]). There was an interval of more than four hours between defendant's arrest and interrogation, there was a significant intervening event, consisting of a reliable statement by an accomplice that implicated defendant and provided probable cause for his arrest (*see People v Berzups*, 49 NY2d 417, 427 [1980]), and there was no flagrant government conduct.

The verdict was based on legally sufficient evidence. Defendant's acquittal of forgery does not warrant a different conclusion, and his appellate argument in this regard rests on speculation as to the jury's thought processes (*cf. People v Rayam*, 94 NY2d 557 [2000]). The jury had a rational basis upon which to reach its mixed verdict.

The court properly exercised its discretion in denying defendant's mistrial motions. With regard to each of the two incidents at issue, the court sustained defendant's objection,

told the jury to disregard the offending testimony, and provided a specific curative instruction in its charge, which the jury presumably followed (*see People v Santiago*, 52 NY2d 865 [1981]). These actions were sufficient to prevent any prejudice. Concur— Saxe, J.P., Nardelli, Williams and Gonzalez, JJ.

Catterson, J., dissents in a memorandum as follows: I am compelled to dissent from the majority because I believe that the evidence of law enforcement misconduct was sufficiently flagrant to warrant suppression of the defendant's statements following his warrantless arrest and incarceration. The facts of the underlying case are relatively undisputed.

On April 29, 2002, Wahvudi Indrathaher, a special investigator for the Department of Social Services, Bureau of Fraud Investigations, was assigned to an investigation involving forged prescriptions that had been presented to a pharmacy in the Bronx. On May 1, 2002, he and other investigators staked out the pharmacy and waited for the individuals who previously submitted the prescriptions to arrive.

Winston Cammock entered the pharmacy and was arrested inside.[1] The pharmacist then told the investigators that Cammock had a friend who was waiting across the street. It is uncontested that without eliciting any further information, the investigators approached the defendant and then detained him in accordance with their standard operating procedure of detaining "anybody who comes with a client in exchange of medicaid prescriptions." Around 1:30 P.M., defendant was arrested and taken to the Bronx District Attorney's office and locked in a holding cage. Meanwhile, based on statements made by Cammock, investigators went to Gregory Guinyard's home and arrested him.

At 2:00 P.M., Guinyard gave an oral statement, and he later signed a written one. Phillip Schaffroth, also an investigator for the Bureau of Fraud Investigations, testified that Guinyard did not implicate defendant. Cammock was given *Miranda* warnings at 2:45 P.M. and signed a statement at 3:00 or 4:00 P.M. According to Schaffroth, Cammock then said that he "along with [Guinyard] met up with [defendant], at which time he supplied them with some prescriptions to be brought to—that he told them to bring to the Melrose Pharmacy."

Around 6:00 p.m., defendant was finally removed from the cage and read his *Miranda* rights. Indrathaher said that defen-

---

1. Indrathaher said it was Gregory Guinyard who was arrested inside and referred to him instead of Cammock, later acknowledging that it could have been either.

dant, handcuffed to a chair, was questioned "for a very long time . . . at least two or three hours, maybe, if not longer or shorter." The purpose was "to find out the reason [he] was with [Cammock]." While defendant initially denied knowing anything about the crime, even after being told that Cammock and Guinyard had "given him up," he ultimately gave an oral statement and signed a written statement drafted by Schaffroth, in which he confessed.

The hearing court ruled that there was no probable cause for defendant's arrest. However, it found that the passage of time between his arrest and interrogation, coupled with the probable cause provided by Guinyard [*sic*], "operated to sufficiently attenuate the defendant's statements from that arrest and 'purged' them of any illegality relating to his arrest."[2] The court did suppress the physical evidence recovered from defendant when he was arrested (suppression hearing 5-6).

Defendant correctly argues that the hearing court erred in failing to suppress his signed statement as the fruit of the poisonous tree, because it was not sufficiently attenuated from the taint of his illegal arrest and was obtained solely by the exploitation thereof. (*See Wong Sun v United States*, 371 US 471, 488 [1963]; *People v Martinez*, 37 NY2d 662, 666 [1975].)

Not all evidence which comes to light because of some prior illegal act by law enforcement officials is legally suppressible under the "poisonous tree" doctrine. Subsequent custodial statements may be admissible when a sufficient attenuation of the link between the illegal detention and the custodial statements exists so as to remove the stigma of the initial police misconduct. (*Wong Sun v United States, supra*; *People v Rogers*, 52 NY2d 527 [1981], *cert denied* 454 US 898 [1981]; *People v Vaughn*, 275 AD2d 484 [3d Dept 2000], *lv denied* 96 NY2d 788 [2001].)

In determining whether a sufficient attenuation exists, three general factors must be examined: (1) the proximity of the proffered statement to the arrest, (2) the flagrancy of the illegal detention, and (3) the occurrence of any significant events intervening between the illegal detention and the particular statement made by the defendant which the People seek to use in the prosecution. (*Brown v Illinois*, 422 US 590, 603-604 [1975]; *People v Martinez, supra*; *People v Vaughn, supra*.) No one factor is dominant and the court must look at whether, based on any of these three factors, "the causal connection be-

2. While the court stated it was Guinyard's statement, it was in fact Cammock's.

tween the illegality and the confession remains." (*People v Harris*, 72 NY2d 614, 620 [1988], *revd* 495 US 14 [1990], *on remand* 77 NY2d 434 [1991].)

In *Harris*, defendant was arrested at his residence without a warrant. Indeed, the police conceded that if the defendant refused to talk to them, they were going to take him into custody. Even though the police had probable cause to suspect the defendant of stabbing his girlfriend to death, they made no effort to obtain a warrant for his arrest. "Indeed, one of the officers testified that it was department policy not to get warrants before making arrests in the home." (72 NY2d at 622). The Court suppressed the defendant's statements, ultimately concluding that "the police illegality was knowing and intentional . . . it 'had a quality of purposefulness', and the linkage between the illegality and the confession is clearly established." (*Id.* quoting *Brown v Illinois*, 422 US at 605.) The import of the Supreme Court's holding in *Brown* echoes strongly in *Harris* and in the instant case. It bears noting that the petitioner in *Brown* was arrested without probable cause because he was an acquaintance of a murder victim. The police acknowledged that they had no probable cause to arrest the petitioner, and that he was arrested merely for questioning in the course of the murder investigation.

"The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was [e]ffected gives the appearance of having been calculated to cause surprise, fright, and confusion." (*Brown v Illinois*, 422 US at 605.)

The parallels to the instant case could not be clearer. The defendant was arrested merely for the purpose of questioning. There is no evidence whatsoever that the investigators did anything at all but arrest defendant because he came to the pharmacy with Cammock and was standing across the street.

"If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. *See Davis v. Mississippi*, 394 U. S. 721, 726-727 (1969). Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the

constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' " (*Brown v Illinois*, 422 US at 602.)

Because I find no distinction whatsoever between the facts of this case and the law enforcement procedures condemned in both *Harris* and *Brown*, I respectfully dissent. I would order defendant's statements suppressed and the matter remanded for a new trial.