OPINION OF THE COURT
Dineen A. Riviezzo, J.
Defendant’s motion to suppress was sent to me for a Huntley/ Dunaway hearing.
I make the following findings of fact and conclusions of law.
Findings of Fact
The sole witness at the hearing was Detective Clint Moody, whose testimony I found to be candid and credible.
Detective Moody testified that on April 9, 2011, he was assigned to investigate a shooting which occurred that same day at 77 Tompkins Avenue, a multiple dwelling located in Kings County. The complainant Khalik Moore, a resident of apartment 13G, stated he was shot by a person standing in the stairwell of the apartment building wearing a “do-rag,” a hood, or “something that covered his face.” (Hearing tr at 8.) The description was limited to the fact that a male person shot him, without any identification as to the race of the perpetrator. (Hearing tr at 30.) In fact, the victim, while hospitalized, told Detective Moody that he didn’t see the shooter’s face. (Hearing tr at 45.) To other officers, the victim stated that the perpetrator was wearing a ski mask. (Hearing tr at 45.) One responding *571 officer transmitted a description of a black male wearing blue jeans, a blue hoodie, and a black ski mask. (Hearing tr at 35.) The victim was shot three times in the stomach or torso, but survived.
On April 12, Detective Moody was informed by other officers of the 79th Squad that the defendant was a suspect in the shooting. The information came from an informant, who stated that someone named “Joey,” who had been shot in front of the same project earlier that year, was responsible for the shooting. (Hearing tr at 9.) It is unclear how “Joey” was identified as defendant Jose Rivera. The informant’s information was based on “what everyone else [was] saying in the neighborhood,” and not any personal knowledge. (Hearing tr at 50.)
Detective Moody ascertained that the defendant was on parole, and that he was scheduled to report to his parole officer on May 11. Prior to May 11, Detective Moody called the defendant’s parole office, told them that defendant was a suspect in a nonfatal shooting, and arranged for parole to “hold” the defendant when he reported on May 11. (Hearing tr at 53-54.) The detective understood that in asking for a “parole hold,” parole would “physically hold him ... in custody until [the detective] came and got him.” (Hearing tr at 75.) At approximately 1:00 p.m., Detective Moody and his partner arrived to “pick up” the defendant, approximately a half hour after being called. (Hearing tr at 12, 53-54.) The defendant was sitting, handcuffed to a chair, when Detective Moody and his partner first observed him. (Hearing tr at 54.)
According to Detective Moody on direct examination:
“His [defendant’s] parole officer . . . took me to the back room where he was at [sic]. There I met Mr. Rivera. After I met him, I let him know we were going back to the 79th Precinct. I did tell him that he wasn’t under arrest, but I did have to place him in handcuffs — put him in handcuffs because that’s the policy. He’s going in the back seat of the vehicle for his safety as well as mine. And I proceeded to take him to the 79th Precinct.” (Hearing tr at 11.)
On cross-examination, Detective Moody further explained:
“Question: When you got to the parole office, at some point Mr. Rivera asks you what this is about, correct?
“Answer: Yes.
“Question: That’s when you said you wanted to take *572 him in for questioning?
“Answer: I was going to take him back to the 79th. He wasn’t arrested, I just needed to talk to him about something.
“Question: So you told him you were going to take him back to the 79 Precinct?
“Answer: That’s correct.” (Hearing tr at 54 [emphasis added].)
On redirect, Detective Moody testified that the defendant “voluntarily” agreed to go to the 79th Precinct:
“Question: Just very briefly, detective, when you went to parole to pick up the defendant, did he have a choice to come with you?
“Answer: He had a choice.
“Question: He had a choice?
“Answer: Yes.
“Question: He voluntarily came with you?
“Answer: He said yes, he will go.
“Question: He never gave you any indication at all that he did not want to come with you to the 70th [sic] Precinct?
“Answer: No, he did not.” (Hearing tr at 73-74.)
After a half-hour drive, during which defendant was handcuffed (hearing tr at 56), they arrived at the precinct. Defendant was brought into the precinct and up to the interview room in handcuffs. (Hearing tr at 57.) He was then placed, without handcuffs, in an interview room. According to Detective Moody, “I didn’t let him know that he wasn’t under arrest.” (Hearing tr at 13.) Nevertheless, the interview room was bolted closed, locked from the outside, and defendant was not free to leave. (Hearing tr at 71.) Defendant declined an offer for food, drink or a cigarette. (Hearing tr at 14.) From the time of arrival at the precinct at approximately 1:30 p.m. until the defendant was Mirandized at 2:45 p.m., Detective Moody prepared to question the defendant, who remained confined in the locked interview room by himself. (Hearing tr at 58, 70.) During this time, Detective Moody created a false photo array which made it appear that defendant had been identified as the perpetrator. (Hearing tr at 18, 19.)
Before beginning the questioning, at approximately 2:55 p.m., defendant was given Miranda warnings. (Hearing tr at 18.) The detective then advised the defendant that he was being *573 questioned with regard to the shooting of Khalik Moore. The detective stated falsely that “people came forward in regards to him being the shooter in this case.” (Hearing tr at 19.) He also stated falsely that “members of the family . . . were speaking about him being involved in the case.” (Hearing tr at 19.)
Shortly after the interrogation commenced, the defendant made an oral statement admitting that he was the perpetrator. The defendant refused to write the statement down. (Hearing tr at 23.)[1]
Arguments of Counsel
Defendant argues that he was unlawfully placed in custody by parole officers at the direction of the police, who lacked probable cause to seize him, as the only predicate for detaining him was surmise, speculation and rumor. Moreover, defendant maintains that he did not voluntarily agree to accompany the officers to the precinct, but instead, merely acquiesced to their authority. (Citing Matter of Daijah D., 86 AD3d 521 [1st Dept 2011] [14 year old did not voluntarily consent to search of purse, but merely assented to officer’s authority].) He asserts that he was continuously in custody, and that there was no intervening event which could relieve the taint of the initial unlawful seizure. Alternatively, defendant argues that his confession was not voluntarily obtained in view of the illegal detention followed by the officer’s “coercive conduct” in employing trickery.
The People argue that there was no continuing, unlawful detention. The defendant, they assert, voluntarily accompanied the detectives to the precinct (citing People v Page, 63 AD3d 506 [1st Dept 2009] [initial unlawful detention by parole officers followed by definite, pronounced break in interrogation]). The People contend that the defendant’s detention by parole ceased when the detectives arrived, and that a reasonable, innocent person in defendant’s circumstances would not have thought that he was in custody. In addition, they argue that handcuffing the defendant during the drive to the precinct did not constitute an arrest (citing People v Perez, 293 AD2d 329 [1st Dept 2002]). The People further contend that the defendant’s post-Miranda statements were sufficiently attenuated from the al *574 leged illegal detention as to be admissible in view of the facts that over two hours had elapsed from the time of the initial detention; that the initial detention by parole ended when the detectives arrived; that the defendant was left by himself “peacefully” for approximately an hour in the interview room; that defendant received Miranda warnings and voluntarily agreed to speak to the detective; and that the use of deception did not render the defendant’s confession involuntary.
Conclusions of Law
Whether Defendant was in Custody
The People must prove that defendant’s statements were voluntary beyond a reasonable doubt (People v Huntley, 15 NY2d 72, 78 [1965]; People v Anderson, 42 NY2d 35, 38-39 [1977]; People v Holland, 48 NY2d 861, 862 [1979]). The prosecutor’s burden also includes the duty to prove, beyond a reasonable doubt, that the defendant was advised of his Miranda rights and that he knowingly and voluntarily waived those rights (Miranda v Arizona, 384 US 436, 471-472 [1966]).
The People do not argue that they had either probable cause or even reasonable suspicion to hold the defendant.[2] Nor do they challenge the initial unlawfulness of parole officers placing the defendant in custody. Rather, the People argue that any illegal detention was dissipated by the fact that the defendant was in effect released, and then voluntarily accompanied the detectives to the precinct.
In People v Page (63 AD3d 506, 507 [2009], supra), relied upon by the People, the First Department observed that “[although defendant was initially seized and handcuffed by parole officers, police detectives immediately removed the handcuffs and clearly conveyed to defendant that the detention had terminated, whereupon defendant agreed to accompany the detectives to be interviewed as a potential witness.” The Court consequently concluded that a reasonable person in defendant’s position, innocent of any wrongdoing, would not have believed that the interrogation was custodial.
What distinguishes this case from Page is that there is compelling evidence that defendant was in custody when he was *575 taken to the precinct, and that the detective did not “clearly convey[ ] to [the] defendant that the detention had terminated.” (People v Page at 507.) Certainly, Detective Moody did testify on redirect in a conclusory manner that defendant “had a choice,” and “voluntarily” assented to go to the precinct. But these conclusory assertions are not supported by Detective Moody’s testimony as to what he actually said. According to Detective Moody, “After I met him, I let him know we were going back to the 79th Precinct. I did tell him that he wasn’t under arrest, but I did have to place him in handcuffs — put him in handcuffs because that’s the policy.” (Emphasis added.) The detective repeated his directive on cross-examination. The statement that defendant was “going back to the precinct” was, as defendant argues, a mandatory direction. The fact that Detective Moody stated to the defendant that he was not under arrest does not mean that a reasonable person innocent of wrongdoing would have understood that he was free to go. To the contrary, the fact that he was immediately handcuffed again, taken to the precinct, escorted in handcuffs into the precinct, and placed in a locked room would indicate to a reasonable person in defendant’s position, free of guilt, that he was in custody, i.e., not free to go, even if not technically under arrest. Further, despite Detective Moody’s redirect testimony that defendant said “yes, he will go,” there was no evidence that defendant was actually asked whether he would go, or given a choice not to go. Finally, unlike the defendant in Page, defendant’s handcuffs were not “immediately” removed — defendant was handcuffed for approximately a half hour in the parole office even before the detectives arrived.
The People argue, relying on People v Allen (73 NY2d 378 [1989]), that the handcuffing of defendant while being transported did not necessarily indicate that the defendant was under arrest. In People v Allen, the Court of Appeals held that handcuffing the defendant during a nonarrest detention did not transform the nonarrest detention into a full-blown arrest. (See also People v Perez, 293 AD2d 329 [2002] [defendant albeit transported in cuffs was not in custody following a nonarrest detention where defendant was neither cuffed nor placed in a cell when he arrived at the precinct]; People v Robinson, 282 AD2d 75, 80 [1st Dept 2001] [“act of handcuffing a suspect does not necessarily convert a detention into an arrest,” but where defendant was taken involuntarily, handcuffed and transported to a police station, and then held in a barred cell for over two *576 hours, the initially proper detention of defendant developed into an arrest].)
The court does not dispute that handcuffing the defendant during transportation to the precinct would not in itself necessarily indicate that defendant was in custody. The fact remains that under the totality of circumstances a reasonable person in defendant’s position, free of guilt, would not have believed that he or she was free to go. Defendant was initially handcuffed, placed again in cuffs while being transported to the precinct, albeit not “under arrest,” brought to the interview room in handcuffs, and then placed in a locked room for over an hour before being given Miranda warnings. Given this unbroken and continuous detention, it is clear that defendant was in custody the entire period of time — a total of approximately two hours. This court is not persuaded, as a factual matter, that the defendant was at any time clearly informed that the initial detention ended, or that he had a choice not to accompany the officers to the precinct. (See People v Robinson, 282 AD2d 75 [2001], supra.) Being advised that he was not “under arrest” is not the same as being told that he had a choice not to go to the precinct. All of these circumstances indicate that a reasonable person would not have believed that he or she was free to leave.
In conclusion, defendant was continuously in custody from the time he was taken into custody by parole officers until the time he was placed in a locked room at the precinct.
Attenuation
The People also argue that regardless of the unlawful detention, defendant’s post -Miranda statements were attenuated from the initial illegality. As stated in People v Conyers (68 NY2d 982, 983 [1986]):
“When a defendant challenges the admission of statements he has made, claiming they are the product of an illegal arrest, the burden rests on the People to demonstrate that the statements were acquired by means sufficiently distinguishable from the arrest to be purged of the illegality. That determination requires consideration of the temporal proximity of the arrest and the confession, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct (People v Johnson, 66 NY2d 398, 407; People v McGrath, 46 NY2d 12, 28-29; Rawlings v Kentucky, 448 US 98, 108; Brown v Illinois, 422 US 590, 603- *577 604). The postarrest administration of Miranda warnings by the police is an important but not a conclusive factor in determining whether the confession was obtained by exploitation of the illegal arrest (Brown v Illinois, supra, p 603).”
Intervening events sufficient to attenuate the taint of an illegal arrest[3] have been held to include a myriad of circumstances:
“The types of intervening events that may affect the defendant’s free will include the defendant’s awareness that someone identified him, that a co-defendant implicated him, that physical evidence exists that connects him to the crime or that the evidence against him is overwhelming. Other events that may qualify include sleeping, eating, and contacting family or a lawyer. Those independent events of which the defendant need not be aware, but that the court may rely upon to find a reduced exploitation of an initial illegality by providing a legal basis for detaining the suspect include the identification of the suspect in a lineup as the perpetrator, the implication by any third party witness or accomplice, and the connection of the suspect to incriminating physical evidence.” (1-4 Brunetti, New York Confessions § 4.03 [3] [c] [2012].)
Here, there were no intervening events which would dissipate the taint of the illegal detention. Indeed, the very purpose of the detention was to enable the police to use deception[4] to question the defendant, knowing that they did not have prob *578 able cause or even reasonable suspicion to detain him — in other words, to “exploit” to the fullest the initial illegal detention. (People v Conyers, 68 NY2d 982, 983 [1986], supra.) This is exemplified by Detective Moody’s testimony that, by asking for a parole hold, he understood that parole officers would place defendant in custody despite his lack of any “concrete” information identifying the defendant as the “shooter.” (Hearing tr at 48, 71.)
While Miranda warnings were given, this did not dissipate the taint of the illegal detention. (See e.g. Brown v Illinois, 422 US 590 [1975] [Miranda warnings could neither automatically nor by themselves protect an accused’s Fourth Amendment rights]; Dunaway v New York, 442 US 200 [1979] [police violated the Constitution when, without probable cause, they seized petitioner for interrogation; while proper Miranda warnings were given and petitioner’s statements were “voluntary” for purposes of the Fifth Amendment, they were inadmissible since no intervening events broke the connection between petitioner’s illegal detention and his confession].)
The People argue that the initial illegal detention ended, which was an intervening event, but the court has rejected that theory as a factual matter. Nor did the mere fact that defendant sat by himself for an hour and 15 minutes dissipate the taint, especially because the defendant was in essence continuously handcuffed for over an hour from the time he was at the parole office until the time he was placed in the locked interview room. (Compare People v Divine, 21 AD3d 767 [1st Dept 2005] [attenuation found where there was an interval of more than four hours between defendant’s arrest and interrogation, there was a significant intervening event, consisting of a reliable statement by an accomplice that implicated defendant and provided probable cause for his arrest, and there was no flagrant government conduct], affd 6 NY3d 790 [2006].)
The motion to suppress is granted.

. The defendant repeated the same statement to another detective shortly after the initial confession. Although no additional GPL 710.30 notice was given, defendant’s motion to preclude made at the hearing was denied as the statement was in sum and substance the same as the initial statement, as to which notice was undisputedly properly given.

. In determining probable cause, the standard to be applied is that it must “appear to be at least more probable than not that a crime has taken place and that the one arrested is its perpetrator, for conduct equally compatible with guilt or innocence will not suffice” (People v Carrasquillo, 54 NY2d 248, 254 [1981]; People v Vandover, 20 NY3d 235, 237 [2012]). Clearly, the detectives did not have probable cause to place the defendant in custody.

. The People cite cases involving “attenuation” under People v Chapple (38 NY2d 112, 114 [1975]), in which the Court held that when an improper, unwarned statement gives rise to a subsequent Mirandized statement as part of a “single continuous chain of events,” the warned statement must also be suppressed. Here, we are dealing with an illegal seizure, not an initial Miranda violation. The mere passage of time will not result, without more, in attenuation. (People v Johnson, 66 NY2d 398 [1985] [elapsed time was I½ and 4½ hours between arrest and statements; no attenuation].)

. In general, deception by the police is not alone sufficient to render a confession inadmissible unless the deception was “so fundamentally unfair as to deny due process,” as when a promise or threat is made that could induce a false confession (see People v Tarsia, 50 NY2d 1, 11 [1980]; People v Pereira, 26 NY2d 265, 268-269 [1970]; People v McQueen, 18 NY2d 337, 346 [1966]; People v Jordan, 193 AD2d 890 [3d Dept 1993] [defendant’s confession was not rendered involuntary because the interrogating police officer told defendant that the victim was alive, and that there were two additional witnesses to the incident]; People v Aveni, 100 AD3d 228 [2d Dept 2012] [granting suppression because the police conduct was so fundamentally unfair as to deny due *578 process where defendant was implicitly threatened with a homicide charge when the police told him that victim was alive but could die]). However, in light of the determination herein, the court need not reach this issue.