THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JASPER GLENN *et al.*, Defendants-Appellants.

Fifth District   No. 76-239

Opinion filed July 19, 1978.

Michael J. Rosborough and Daniel M. Kirwan, both of State Appellate Defender's Office, of Mt. Vernon, for appellants.

Clyde L. Kuehn, State's Attorney, of Belleville (Bruce D. Irish and Ann E. Singleton, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE McCALLISTER delivered the opinion of the court:

Defendants-appellants Jasper Glenn and Ronnie Lee Cunningham were indicted in the Circuit Court of St. Clair County (along with Carl Wayne Wilson, who is not involved in this appeal)[1] for the offenses of

---

[1] Wilson was tried separately. His jury trial resulted in verdicts and sentences identical to those imposed on appellants. His convictions and sentences were affirmed by unpublished order of this court filed September 6, 1977.

murder, armed robbery, and two counts of aggravated battery. Both defendants were found guilty of all four charges and sentenced to 100 to 150 years for murder, 10 to 25 years for armed robbery, and 3 to 9 years for each aggravated battery. The sentences for armed robbery and aggravated battery were ordered to run concurrently with each other, and consecutive to the sentence for murder.

On appeal, defendant Glenn contends that the confession introduced against him at trial should have been suppressed on two grounds: it was the product of an illegal arrest, and the prosecution failed to prove that it was voluntarily made. Both defendants contend that their sentences should be modified to run concurrently, and that the sentences of 100 to 150 years imprisonment for the offense of murder were excessive.

The instant prosecutions followed police investigation of a particularly brutal attack on an elderly couple and their mentally retarded adult son in their home in East St. Louis during the early morning hours of February 13, 1975. A full chronicle of the abuse suffered by the victims during their night of terror would serve no purpose here. Suffice it to say that they were repeatedly beaten and abused while their assailants ransacked their home and reduced it to a shambles. The elderly woman estimated that the ordeal lasted for at least two hours. Her husband died later that morning from the beating.

Both defendants were arrested on February 15. Glenn's arrest occurred at about 9:30 a.m. Shortly after he was taken to police headquarters, advised of his rights by a juvenile officer, and informed that he could be prosecuted as an adult, he submitted to questioning and confessed to his participation in the murder. Several hours later, he signed a written confession.

Glenn was bound over for prosecution as an adult, and probable cause was found after a preliminary hearing. At arraignment he entered a plea of not guilty, and his counsel filed several motions, including a motion to suppress the confession and a motion for change of venue. Venue was subsequently changed to Randolph County. A motion for a hearing into Glenn's fitness to stand trial was also granted, and a hearing held. Two examiners, a psychiatrist and a psychologist, testified that they had concluded from their examination of Glenn that he was fit to stand trial and capable of cooperating with counsel.

After a lengthy hearing, the court denied Glenn's motion to suppress his confession. Glenn then waived his right to trial by jury, and elected to be tried by the court on stipulated evidence. Cunningham was tried by a jury. Both defendants were found guilty, post-trial motions were denied, and the sentences indicated above were imposed. These appeals followed.

Glenn's written motion to suppress alleged that the confession was not

made freely and voluntarily; that it was induced by promises of leniency and by physical and psychological coercion, duress, and violence; that he had not been admonished as to his rights; and that he had neither the mental capacity to understand the giving of the confession nor the reading ability to understand the written statement.

When the motion came on to be heard, Glenn's counsel made an oral motion that the court compel the State to divulge the name of the confidential informant mentioned in police reports of the investigation, along with the substance of the information provided by the informant. Counsel argued that the sole basis for the arrest of his client was information provided by the informant, and that without any information as to the reliability or veracity of the informant or the accuracy of his information, there could be no finding of probable cause for arrest. The prosecutor argued that the defendant's request on the eve of trial was not timely, that the question of probable cause for arrest had been waived by failure to raise it in the written motion to suppress, that the informant was not available, that his life would be in jeopardy if his name were revealed, and that his information was in any event not the sole basis for Glenn's arrest. On appeal, the court's denial of defendant's oral motion is raised as error.

■■ Although the mere unsupported representation by the prosecution that there is reason to fear for an informant's safety is not sufficient to deny disclosure of his identity (see, *e.g.*, *People v. Gibson*, 54 Ill. App. 3d 898, 370 N.E.2d 262 (4th Dist. 1977)), we do not think that the court below erred in finding that there was probable cause for Glenn's arrest. A review of the entire record reveals that the authorities had begun an intensive neighborhood investigation as soon as the offenses were discovered. They had learned of a social gathering which had been held nearby on the previous evening and the names of several people that were present. Information received before the telephone call from the confidential source indicated that one of the people involved was "a tall subject believed to be called Jake or Jason." Other information implicated a black male juvenile residing in the 2300 block north of 23rd and State Streets. Defendant Jasper Glenn, a tall, black male juvenile, lived at 567 North 23rd Street.

■■ Recently, in *People v. Robinson*, 62 Ill. 2d 273, 276, 342 N.E.2d 356 (1976), our supreme court has summarized the law relating to probable cause for arrest:

"* * * There is probable cause when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. [Citation.] This court observed in *People v. Jones*, 31 Ill. 2d 42, 47,

that '* * * reasonable cause means something less than evidence which would result in a conviction, and it is also established that reasonable cause may be founded upon evidence that would not be admissible at trial.'

In considering whether probable cause existed, we stated in *People v. Clay,* 55 Ill. 2d 501, 504-05, 'Whether or not probable cause for an arrest exists in a particular case depends upon the totality of the facts and circumstances known to the officers when the arrest was made. [Citations.] In deciding the question of probable cause in a particular case the courts deal with probabilities and are not disposed to be unduly technical. These probabilities are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. *Draper v. United States,* 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329; *People v. Fiorito,* 19 Ill. 2d 246.' Also it is proper to recognize in judging whether there was probable cause that '[p]olice officers often must act upon a quick appraisal of the data before them, and the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals.' *People v. Watkins,* 19 Ill. 2d 11, 19."

In light of all the information known to the authorities at the time of Glenn's arrest, we think that they did have probable cause to arrest him.

We should point out that, even if we had reached the conclusion that the arrest was illegal, Glenn's confession would not necessarily have to be suppressed under the rule of *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Appellant contends that the circumstances in the instant case are nearly identical to those in *Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, (1975). In *Brown,* the Supreme Court held that the fact that Miranda warnings were given alone cannot always make the act of confessing sufficiently a product of free will to break the causal connection between the illegality and the confession. In declining to adopt any "per se" or "but for" rule, the court stated:

"* * * The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only fact to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances [citation],

and, particularly, the purpose and flagrancy of the official misconduct are all relevant.* * *" 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254.

■■ In the instant case, unlike *Brown,* there is no indication that Glenn's statements were obtained by exploitation of his arrest. The impropriety of the arrest, assuming *arguendo* that it was somehow improper, was certainly not obvious; the actions of the officers had no quality of purposefulness; there is no indication that the manner in which the arrest was effected was calculated to cause surprise, fright, and confusion. If there was any "taint," we think that it was purged by the defendant's intervening independent act of free will in confessing.

At the hearing on the motion to suppress the confession, State Police Detective Terry Delaney testified that he interrogated Glenn during the morning of February 15, 1975, after Miranda warnings had been read to Glenn. He informed Glenn of the crime about which he was being questioned, and Glenn first indicated that he didn't know what Delaney was talking about. When Delaney informed him that he had received information through interviews on the street that Glenn was in fact in that neighborhood during the time of the offense, Glenn admitted that he was there with Cunningham and Wilson, but claimed that he had just stood on the corner of 24th Street and State while the other two went into the house and that he did not participate. After Delaney told Glenn that the police had received information from one of the surviving victims that she had been terrorized for upwards of two hours, and that it was not believable that he had stood on the corner for that length of time in the freezing temperatures, Glenn changed his story again and admitted that in fact it had been he who knocked at the victim's door and that he had participated. Delaney prepared a written statement later in the day which was substantially the same as the oral statement, and Glenn signed it. At no time did Glenn ask to see an attorney or advise Delaney that he didn't want to make any more statements. Glenn never told him that he had been beaten by anybody while in custody.

Glenn's testimony was contradictory and internally inconsistent. He testified that he had been threatened and beaten by a black juvenile officer, who "told me if I didn't make this statement that he was going to let the honkies get me." He admitted that one of the officers had advised him of his rights and that he had initialled and signed the statement of his rights. He said that he did not quite understand what was being read to him, and that no one attempted to explain it to him. He said that he had told the police that he didn't want to talk anymore and then he "started getting jumped on." He testified that it was his signature on the statement written out by Detective Delaney. He said that he couldn't read Delaney's handwriting. Asked whether anyone explained to him that he didn't have

to sign the statement, he answered, "yes, sir, but that's what all the harassing was for." Asked what he meant by that, he responded, "because I didn't want to sign it." On cross-examination, he testified that it was not Delaney but a black officer who wrote out the statement which he signed.

The psychologist testified that she had examined and tested Glenn and found that he had an I.Q. of 55, placing him in the moderately retarded range, or the lower 2.2% of the population. She went over the statement of constitutional rights with Glenn, and found that he had difficulty in reading it. She concluded that he had a vague idea of the contents, but missed a lot of the legal details. She testified that in her opinion under the circumstances of custodial interrogation it would be doubtful whether Glenn would be able knowingly to waive his rights. She stated that in general he had an idea of most of his rights, but that "even under the best conditions he couldn't understand the word to waive."

At the close of all the evidence, the court stated that there was no doubt whatsoever that Glenn had been informed of his rights on several occasions, and indicated that the testimony to the contrary was incredible, as was the testimony as to physical abuse and threats. The court stated that the only serious question presented was whether Glenn fully understood his rights, and concluded in view of all the facts and circumstances that he did. The court said:

> "* * * Now this is particularly true with respect to Mr. Glenn at the time he gave the written statement. Now as I understand the testimony, he gave the oral statement in the morning sometime, then in the afternoon, when Mr. Delaney or Sergeant Delaney discovered the statement had not been reduced to writing, it was then taken from him in writing. Now here he had at least 4 to 5 to 6 hours to think about what he had stated orally and if he wished to retract that or deny it before he gave the written statement, he certainly had a good opportunity in there to think about it and then also, this is particularly significant, I think, because he was a juvenile at the time and in view of his mental capacity* * *. So in view of all the facts and circumstances in this case, I feel that Mr. Glenn, even though he was a juvenile and he isn't the smartest guy and even though his educational level is not very high, I think by the time he gave the written statement there should be no question he understood what it was all about and particularly had time to think about it* * *."

We must accept the trial court's determination of the facts and will not disturb its ruling unless it is against the manifest weight of the evidence. (*People v. Anthony*, 38 Ill. App. 3d 427, 347 N.E.2d 770 (5th Dist. 1976).) We do not think that the court's determination that Glenn's

statement was voluntary was against the manifest weight of the evidence. The court here used that "special care in scrutinizing the record" required when dealing with juveniles of borderline intelligence. See, *e.g., People v. Simmons,* 60 Ill. 2d 173, 326 N.E.2d 383 (1975).

■■ As to the contention that the State should have been compelled to produce two police officers who allegedly witnessed or engaged in beating and threatening Glenn during the period when his statements were being obtained, we think that the error, if any, was harmless where, as the court found, the testimony as to physical abuse was incredible and there was testimony contradicting Glenn's as to each relevant time period involved.

■■ Finally, both defendants contend that their sentences should be modified to run concurrently because there was no determination by the trial judge, nor evidence of record, that there was a substantial change in the nature of their criminal objective, nor that consecutive sentences were necessary to protect the public from further criminal conduct by the defendants, the two criteria required for the imposition of consecutive sentences by the law in effect at the relevant time. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—4.) We disagree.

Evidence of record, including the statements of the defendants, makes it quite clear that the initial objective was robbery, and that this objective changed after the elderly man shot Glenn with an air rifle. As to the second criterion, one could hardly find a set of circumstances indicating more clearly that the public needs protection from these defendants. As indicated previously, this was a particularly vicious and unprovoked attack on victims two of whom were elderly and one of whom was mentally retarded. No evidence in mitigation was presented by either defendant. The court below was well justified in concluding that the protection of the public required consecutive sentences.

■■ Nor can we agree with the defendants' contention that their sentences of 100 to 150 years for murder are excessive and should be reduced. We do not think that these sentences, within the limits prescribed by legislature, vary greatly from the purpose and spirit of the law. They meet the constitutional requirements that the punishment imposed reflect both the nature of the offense and the possibilities of rehabilitation. In any event, as we pointed out in affirming a sentence of 100 to 200 years in *People v. Henderson,* 45 Ill. App. 3d 798, 359 N.E.2d 909 (5th Dist. 1977), the minimum is of little consequence because of parole eligibility rules.

For the foregoing reasons, the judgments and sentences of the Circuit Court of St. Clair County are affirmed.

EBERSPACHER, P. J., and KARNS, J., concur.