IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 14, 2009

## CURTIS DANIEL HART v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Tipton County**
**No. 5207     Joseph H. Walker, III, Judge**

---

**No. W2008-02715-CCA-R3-PC  - Filed March 18, 2010**

---

The petitioner, Curtis Daniel Hart, appeals the denial of his petition for post-conviction relief and contends that he received ineffective assistance of counsel.  He was initially convicted of second degree murder, simple possession of marijuana, and simple possession of Alprazolam, a Schedule IV controlled substance, and sentenced to thirty-five years in confinement as a Range II offender.  On appeal, the petitioner argues that counsel was ineffective in a variety of areas but failed to prove any of the allegations.  Therefore, we affirm the judgment from the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Jeffrey L. Stimpson, Munford, Tennessee, for the appellant, Curtis Daniel Hart.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General;  D. Michael Dunavant, District Attorney General; and Tyler Burchyett, Assistant District Attorney General, for the appellee, State of Tennessee
.

## OPINION

This court set out the facts underlying the petitioner's conviction in an opinion on direct appeal as follows:

On the morning of August 8, 2005, the forty-nine-year-old victim, Barry Crane, was found murdered at his residence in Tipton County. Although the victim shared his home with his son, Scottie Crane, his daughter, Miranda, and her small child, none of the victim's family were at home on the night of the

homicide. Instead, the victim was discovered by his next door neighbor, Marvin Fletcher. Fletcher found the victim, who had sustained two gunshot wounds to the back of his head, laying on the floor with his legs crossed. The victim held a muzzle loader rifle, and a pool of blood was beside his head. The investigation was initially treated as a possible suicide, but TBI Special Agent Donna Turner investigated the crime scene and determined that the body had been moved and "positioned" after being shot. An inventory of the house by Scottie Crane revealed that a .9mm Taurus semi-automatic pistol and a "SKS" Chinese assault rifle were missing.

Tipton County Sheriff's deputies began routinely interviewing all of the neighbors in the immediate area. One of the first interviews conducted was of the Appellant, who lived across the street from the victim with Adam and Rachael Thomas. The Appellant told the deputies that he had visited with the victim the night before the victim's death, but he stated he had left around 7:00 p.m. He also advised the deputies that he had seen a small car drive by the victim's house, return, drive up the victim's driveway, pull out, and drive off around 9:30 p.m.

Later that day, while officers were still at the scene, the Appellant summoned a deputy into his yard and showed the deputy an "SKS" assault rifle, which the Appellant stated he had found near Thomas' mailbox. The Appellant gave a written statement to an investigator and stated, "I want to make sure that everyone knows that I did not kill [the victim]. I had nothing to do with him dying." The Appellant did, however, admit that he had sold the victim twenty Xanax pills for $90.00 on the afternoon of August 7th.

On the night of August 8th, however, the Appellant confided in the Thomases that he shot the victim. He explained to them that the victim had been drinking and began going through the house gathering guns. The Appellant said "he felt trapped . . . it happened so fast that he just shot him, because he got cut and he felt threatened." Mr. Thomas recalled, at the time he related this information, the Appellant had only a "small scratch above his eyebrow." At trial, Thomas examined a photograph of the Appellant taken by investigators and commented that the cut in the photograph looked deeper than it had on August 8.

On August 9, 2005, the Appellant contacted his former employer and showed him an abrasion on his forehead. The Appellant stated, "[t]hat's where a guy held a knife to me, and I popped him twice in the chest." The

Appellant's former employer then called the Sheriff's Department and reported the conversation. As a result, Agent Turner returned to the Appellant's residence to re-interview the Appellant later that day. Prior to the interview, the Appellant was searched, and a small amount of marijuana and a number of Xanax pills were recovered from his person. During this interview, the Appellant admitted to shooting the victim with the .9mm pistol and to disposing of the handgun by dumping it in a garbage can at a nearby Circle K store.

The Appellant provided Agent Turner with the following statement:

> I want to do the right thing and get this straight. I shot and killed [the victim]. I want to take responsibility for my actions. It is the right thing to do. I was led by the Lord to tell the truth on what happened.
>
> . . . .
>
> On Saturday night [August 6, 2005] I was playing poker at [the victim's] house. . . .
>
> During the game I pulled out a bottle which contained Xanax. I used to have a prescription, but I get these off the street. I broke one bar off and [the victim] asked what it was. I told [him] that it was Xanax. [He] said he needed some for a sick friend.
>
> I asked him how many he wanted, and he asked how much are they. I told him four dollars apiece or four fifty delivered. [The victim] handed me a hundred dollar bill and told me to take care of it. . . .
>
> . . . .
>
> On Sunday morning . . . I took [the victim] 20 Xanax and a $10 bill. They were in a cigarette cellophane package. . . .
>
> . . . .

-3-

I was there about . . . an hour and a half. . . . I left and went back down to my house.

I went to bed between 9:45 and ten o'clock p.m. I couldn't go to sleep. . . . I remembered I had left my glasses up there at the house.

I walked to the house, and [the victim] was sitting at the table on the carport. [The victim] was drinking. [He] took a couple shots of Seagram Seven . . . .

We walked in the kitchen, and [the victim] poured him a shot. [The victim] drank it, and he said, 'Let me show you what I have.'

. . . .

. . . When I walked in the living room, [the victim] had at least four rifles leaned against the cushions on the couch nearest the front door. . . .

[The victim] said . . . 'Come on and let's go get us a shot.'

We walked back into the kitchen. [The victim] pulled a pistol out of his front pocket. [The victim] was wearing bib overalls. [The victim] laid the pistol on the kitchen table. . . .

[The victim] poured two shots. I told him I didn't want a shot. [The victim] was getting a little mouthy and talking smack. He drank both shots. [The victim's] whole demeanor changed. [The victim] looked at me and said 'You think you are the baddest thing walking.'

I asked him what that was - where that was coming from. I was ready to leave the house. I took a step to the left. [The victim] kind of hemmed me up against the table and pulled a knife out of his back pocket. It looked like it was a butterfly knife. [The victim] stuck it to my forehead and told me he could cut my face off.

[The victim's] belly had me pinned against the table. I took my arms and swept [the victim's] arms to get the knife away from my head. The knife came out of his hands. I don't know where it landed.

I reached and got the pistol off the kitchen table. I picked it up with my right hand, and I shot him. [The victim] staggered a few feet, and I shot him again.

The first time I shot, I don't know if I hit him or not. I was standing between the kitchen and living room area. [The victim] started staggering where the guns were and looked to me a little incoherent. He looked like he was going down on his knees.

I stepped into the living room. That's when I shot the second time. The second shot was at a downward angle. I shot him the second time because I wasn't sure I had hit him the first time.

[The victim] fell down right in front of the couch. He was like lying on his side. I didn't see any blood on [the victim]. I didn't walk up on him. I did not touch [the victim] at all. I did not roll him over. I never got within three or four feet of [the victim] after I shot him.

. . . .

I did not check [the victim] to see if he was dead. He never said anything after I shot him. I was not arguing with [the victim] when I shot him. It was like an ego thing with him. It made [the victim] mad when I wouldn't take the shot of whiskey.

. . . [The victim] was just a nice guy, but that night he had totally changed. When [the victim] stuck that knife to my head, he scared me. I reacted the only way I knew to survive.

. . . When I got to my house, I went in and had the pistol in my shorts pocket. I sat down in the chair. I ate three Xanax and went to sleep. . . .

-5-

The postmortem examination revealed two gunshot wounds to the head, each of which would have proved fatal. One gunshot entered the middle of the back of the victim's head and exited in front of the left ear. The other gunshot wound entered the left side of the victim's back, a little below the nape of his neck and exited in front of the left ear. The victim's blood alcohol content was 0.16 percent.

On November 7, 2005, a Tipton County grand jury returned a three-count indictment against the Appellant, charging him with: (1) second-degree murder; (2) possession of Alprazolam, a Schedule IV controlled substance, with intent to deliver; and (3) simple possession of marijuana. The Appellant filed a motion to suppress the statement he gave to Special Agent Turner on August 9, 2005, but, after a hearing, the motion was denied. At trial, the Appellant did not testify but relied on his statement as evidence that he had shot the victim in self-defense. The jury rejected the Appellant's argument and found him guilty of second-degree murder. The jury also found the Appellant guilty of simple possession of Alprazolam and simple possession of marijuana, but the Appellant does not challenge those misdemeanor convictions on appeal. The Appellant was sentenced to thirty-five years, as a multiple offender, for second-degree murder, and his misdemeanor sentences were ordered to run concurrently, resulting in an effective sentence of thirty-five years. Following the denial of his motion for new trial, the Appellant filed the instant timely appeal.

*State v. Curtis Daniel Hart*, No. W2006-01332-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 625, **8-9 (Tenn. Crim. App. Aug. 9, 2007), *perm. to appeal denied* (Tenn. Jan. 28, 2008).

During the hearing on the petition for post-conviction relief, the petitioner's trial counsel testified that he was employed as the Public Defender for the Twenty-Fifth Judicial District of Tennessee and was appointed to represent the petitioner. He testified that he took over the case prior to trial even though a different attorney from their office had initially been appointed to represent the petitioner. Counsel testified that the primary theory of defense was to demonstrate that the petitioner acted in self-defense.

Counsel recalled that a motion to suppress had been filed to exclude statements the petitioner made to law enforcement at the time he was arrested, as well as a statement recorded and transcribed while the petitioner was incarcerated. Counsel said that he contested the statement on the basis that the petitioner was not *Mirandized*, but the trial judge ruled against their motion on the basis that the statements were made voluntarily and were made prior to being in custody. Counsel testified that the petitioner's previous attorney left

-6-

the public defender's office after handling the initial points of the petitioner's case, including the motion to suppress. He did not file a motion to challenge the time between the petitioner's arrest and the time he was taken before a magistrate because there was not an unreasonable lapse of time between the two events. Trial counsel did not file a motion to suppress evidence found at the crime scene based on possible contamination by a dog that ran around after the body was found, but prior to the arrival of the police. He had no specific reason on which to base a motion to suppress.

Counsel testified that he felt prepared for trial after interviewing witnesses and reviewing photographs of the crime scene, written statements, and preliminary hearing transcripts. He also said that the assistant district attorney threatened to re-indict the petitioner on first degree murder charges if he asked for a continuance. The transcripts from the jury trial, the motion to suppress, and the preliminary hearing were entered as exhibits during his testimony.

The petitioner testified that he was concerned that counsel would not be prepared to proceed to trial. He wanted counsel to be familiar with him as a person so he asked for a continuance. Counsel did not file a motion for a continuance. Counsel told him that he spoke to the District Attorney General about a continuance and that he was told the State would seek an indictment for first degree murder if the case was continued. The petitioner testified that he told counsel to get the continuance because he was not concerned about a first degree murder charge any more than the second degree murder charge. Counsel told the petitioner that he did not want the first degree murder indictment, and that was the last time they discussed the issue.

The petitioner testified that he was not *Mirandized* when he gave his initial statement to police, which he thought was wrong. He testified that his first attorney did not raise the *Miranda* issue during the preliminary hearing but argued only that the petitioner was on Xanax when he gave the statement. At the beginning of trial, the petitioner stated that he planned to testify in his defense. He said that he made the decision not to testify because he was afraid of "slipping" and mentioning his previous murder conviction. He acknowledged that counsel had filed a Motion in Limine to keep the prior conviction out. He said he took the safe route by not testifying.

The petitioner testified that his case was prejudiced by allowing the State to introduce a pill bottle with someone else's name on it. Counsel did not object to the introduction of the evidence. He was under the impression that the State would not be able to introduce any evidence from the crime scene because a dog had been allowed to roam the scene and cause contamination.

-7-

The petitioner said he was concerned that some firearms missing from the victim's home had not been fingerprinted. He was also concerned that the record on appeal was incomplete. He testified that he was not brought before a magistrate in a timely fashion but that he did not think his counsel was deficient in that regard.

The petitioner clarified that he was willing to have his case continued and felt he had as good a chance to defend a first degree murder charge as he did a second degree murder charge. He maintained he was not guilty of the killing.

The post-conviction court found that the defendant failed to establish that a basis for suppression existed beyond what was argued at the suppression hearing and, therefore, failed to show deficiency by counsel.

Analysis

On appeal, the petitioner argues that counsel was ineffective in several areas including: failure to include alleged arrest and *Miranda* violations in the motion to suppress; failure to request a continuance; failure to request documents from the prosecution; permitting an empty pill bottle to be admitted into evidence; failure to object to testimony regarding missing guns from the victim's residence; failure to file a motion to suppress based on alleged crime scene contamination; and failure to contest sentencing.

This court reviews a claim of ineffective assistance of counsel under the standards of *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975), and *Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner has the burden to prove that (1) the attorney's performance was deficient, and (2) the deficient performance resulted in prejudice to the petitioner so as to deprive him of a fair trial. *Strickland,* 466 U.S. at 687; *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996); *Butler v. State*, 789 S.W.2d 898, 899 (Tenn. 1990). The failure to prove either deficiency or prejudice justifies denial of relief; therefore, the court need not address the components in any particular order or even address both if one is insufficient. *Goad*, 938 S.W.2d at 370. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

The test in Tennessee to determine whether counsel provided effective assistance is whether his or her performance was within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. The petitioner must overcome the presumption that counsel's conduct falls within the wide range of acceptable professional assistance. *Strickland,* 466 U.S. at 689; *State v. Honeycutt*, 54 S.W.3d 762, 769 (Tenn.

2001). Therefore, in order to prove a deficiency, a petitioner must show "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland,* 466 U.S. at 688).

In reviewing counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Nichols v. State,* 90 S.W.3d 576, 587 (Tenn. 2002) (citing *Strickland,* 466 U.S. at 689). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997); *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

In his first issue, the petitioner contends that counsel was deficient for failing to raise the additional grounds of illegal arrest and *Miranda* violations in the motion to suppress. The petitioner seems to dispute that he was not taken before a magistrate in a timely manner and that he was not advised of his *Miranda* rights before he was taken into custody. Trial counsel testified that there "was no lapse of reasonable time" before the petitioner was taken before a magistrate. Even if the petitioner was not taken within 48 hours, his statement would not have been suppressed because the petitioner's statement was not as a result of an alleged violation of the petitioner's right. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991).

Courts apply the "fruit of the poisonous tree" analysis to determine if a statement should be suppressed as a result of a *McLaughlin* violation. *State v. Huddleston*, 924 S.W.2d 666, 676 (Tenn.1996). The focus of the analysis is on whether the evidence was obtained by exploitation of the Fourth Amendment illegality. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). As the United States Supreme Court has recognized, when considering whether a statement obtained in violation of the Fourth Amendment must be suppressed, the question is "whether [the statement] 'was sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" *Brown v. Illinois*, 422 U.S. 590, 598 (1975) (quoting *Wong Sun*, 371 U.S. at 486). To assist in the analysis, the Tennessee Supreme Court has identified four factors: (1) the presence or absence of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and, finally, of particular significance; (4) the purpose and flagrancy of the official misconduct. *Huddleston*, 924 S.W.2d at 674-675. If this challenge had been raised at trial, the burden of proving the admissibility of the challenged evidence would have rested on the prosecution.

The record contains a transcript of the preliminary hearing in which the officer who initially spoke with the petitioner testified that he advised the petitioner of his *Miranda* rights prior to any questioning. The officer also testified that the petitioner appeared to understand and waive his rights prior to questioning. The waiver of rights form was made an exhibit during that hearing. The record is devoid of any evidence that the State purposely detained the defendant longer than 48 hours to gather additional evidence or otherwise continue the investigation.

The petitioner bears the burden of establishing that the motion would have been granted if presented. Here, the petitioner has failed to meet this burden. The defendant also failed to prove deficient performance or prejudice resulted from counsel's decision against filing a motion to suppress based on his alleged violation of his Fifth Amendment right against self-incrimination. The record reflects that the petitioner was advised of his *Miranda* rights before he was questioned. Testimony revealed that the petitioner was taken into custody and transported to the police station but was not questioned until he had been advised of his rights. The petitioner has not established that counsel was deficient or that he was prejudiced by the absence of a motion to suppress the statement. Counsel testified that such a motion would have been without merit. The petitioner is not entitled to relief on this issue.

Next, the petitioner argues that trial counsel was ineffective for failing to secure a continuance. The petitioner has failed to demonstrate how he was prejudiced by counsel proceeding to trial. Counsel testified that he was adequately prepared for trial. He had interviewed every witness who would speak with him, met with the petitioner multiple times, reviewed photos of the scene, examined prior written statements, and studied the preliminary hearing transcripts. Counsel further testified that when he approached the district attorney general's office regarding a continuance, he was informed that a continuance might result in an indictment for first degree murder. Counsel testified that he did not need the continuance and proceeded to trial. The petitioner has not demonstrated how a continuance would have changed the result of the trial or that counsel was ineffective for failing to have the case continued. This issue is without merit.

Next, the petitioner argues that counsel was ineffective for failing to ask for exculpatory materials. During the post-conviction hearing, the petitioner failed to introduce any evidence that counsel did not request these materials. Trial counsel testified that he did not specifically request a knife that was shown on a videotape of the crime scene because he did not believe the State had possession of it. Further, the petitioner failed to demonstrate that the State actually had possession of the knife. The petitioner has not demonstrated ineffective assistance on the part of trial counsel for failing to request a piece of evidence that counsel did not believe was in the State's possession. The petitioner also failed to demonstrate that counsel did not request all potential exculpatory materials.

The petitioner also contends that counsel should have moved to suppress the pill bottle found at the crime scene. However, counsel testified that the pill bottle had Marvin Fletcher's name on it and that it raised doubt about whether or not the petitioner was the victim's killer. However, the petitioner failed to demonstrate that the pill bottle would have been suppressed. The State introduced the pill bottle to demonstrate that, prior to the murder, the petitioner sold Xanax to the victim and then took back the pills. The presence of the bottle was demonstrative of motive and, therefore, was relevant. The State suggests, and we agree, that any danger of unfair prejudice did not substantially outweigh the probative value. The petitioner has failed to demonstrate that he was prejudiced by the decision against trying to suppress the evidence.

Next, the petitioner argues that counsel was deficient for failing to object to testimony regarding guns missing from the victim's home. In addition to a theory of self-defense, counsel pursued a theory that the crime scene had been tampered with prior to the arrival of the police. The testimony regarding the missing guns supported that theory because, if someone else had entered the home, they might have taken the guns. It is not our function to "second guess" the tactical decisions of counsel or to measure the representation by "20-20 hindsight." *Henley*, 960 S.W.2d at 579; *Hellard*, 629 S.W.2d at 9. It was a reasonable tactic by counsel to allow the testimony about the missing guns to be introduced into evidence. This petitioner is not entitled to relief on this issue.

Next, the petitioner argues that counsel was deficient for failing to file a motion to suppress based on contamination of the crime scene. Marvin Fletcher, who discovered the body of the victim, allowed his dog to run around the crime scene before the police arrived. However, the petitioner has not produced evidence to demonstrate that the crime scene was contaminated as a result. Counsel did not file a motion to suppress all the evidence at the crime scene as a result of the contamination because he did not have any specifics on which to base a motion. He testified that he did not hire an expert to determine what had been contaminated because he did not have access to the crime scene on the day of the crime and any analysis would have been based on photographs, which he did not deem to be helpful. When counsel declines to file a motion to suppress because he has no basis to support the motion, it does not rise to the level of deficient performance. The petitioner has not asserted a theory upon which the motion would have been successful.

Next, the petitioner argues that counsel was ineffective for failing to object that he was sentenced in violation of *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007). The petitioner was sentenced on May 12, 2006, prior to the decision in *Gomez II*. At the time the petitioner was sentenced, the controlling authority stated that the Tennessee Sentencing Reform Act of

1989 did not violate *Blakely v. Washington*, 542 U.S. 296 (2004).  Therefore, it cannot be deficient performance for counsel to fail to argue law that did not yet exist.

Next, the petitioner argues that trial counsel failed to challenge the trial court's ruling on the motion to suppress on direct appeal.  However, that issue was raised on direct appeal, and this court determined that the trial court correctly denied the motion to suppress.  *See Curtis Daniel Hart*, No. W2006-01332-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 625, at **9-17.

Next, the petitioner argues that counsel rendered deficient performance for submitting the motion for new trial to the judge without a hearing.  The petitioner asserts that his Sixth Amendment rights were violated because there was not a hearing on the motion and because he could not be present.  However, the defendant does not have a constitutional right to be present at the motion for new trial.  *See Cisco v. State*, 28 S.W.2d 338, 684 (Tenn. 1930).  The court in *Cisco* held that a motion for new trial was not a part of the trial and that the constitutional right to be present ends with the verdict at trial.  The petitioner is not entitled to relief on this issue.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE

-12-