

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00257-CR

Robert Lane **MARSH**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2009CR0761
Honorable Lori I. Valenzuela, Judge Presiding

Opinion by:     Sandee Bryan Marion, Justice

Sitting:         Karen Angelini, Justice
                Sandee Bryan Marion, Justice
                Patricia O. Alvarez, Justice

Delivered and Filed:  May 1, 2013

AFFIRMED

Robert Lane Marsh, appellant, appeals his conviction for possession of a firearm by a felon after he entered a plea of nolo contendere pursuant to a plea bargain. Prior to his plea entry, appellant filed a motion to suppress his consent to search his property. The trial court denied his motion to suppress. After accepting his plea, the trial court sentenced appellant to eight years in prison and assessed a fine of $1,500.00. In one issue on appeal, appellant asserts the trial court erred in denying his motion to suppress because his consent to search was invalid. We affirm.

**BACKGROUND**

Deputy Wood was patrolling an area with a high rate of motor vehicle burglaries—including stolen motorcycles. Wood testified that an auto theft unit notified him they would be in the area and were going to check on a house. The auto theft unit asked Wood if he would come over to the area because they needed a marked patrol unit there. On his way to the area, Wood noticed a small Mazda pickup truck leaving the area with a motorcycle in the back. He testified he observed "a large motorcycle in a little bitty truck" and this made him suspicious because "[s]eeing that motorcycle put in the back of the truck is a common thing if people pick up things that don't belong to them, they don't have the right size vehicles for hauling things. I'm not saying that it was stolen. I'm saying I had a suspicion that it did not belong to that truck." Wood testified he could not tell if the motorcycle was secured and it appeared to be a safety concern because if it was not properly secured the motorcycle could possibly fall out of the truck and into traffic. Wood proceeded to perform a vehicle stop for the potential safety violation. Appellant pulled over.

After Wood pulled appellant over, Wood noticed the license plate on appellant's truck was a standard Texas plate; however, the license plate on the motorcycle was a handicap plate. He testified he found this suspicious because handicap plates are not usually on motorcycles and if they were "you would figure the plates would be the same on both" the truck and the motorcycle. Wood radioed the auto theft unit to let them know he had made a stop. Wood testified he gave appellant's name and the information about the motorcycle in the back of the truck to the officers in the auto theft unit and they came to meet him at the scene.

Wood took appellant's driver's license and proof of insurance. While the officers in the auto theft unit were speaking with appellant, Wood testified he was in his patrol car running the plates on the motorcycle to determine whether the plates and the Vehicle Identification Numbers

(VIN) matched. His investigation revealed that all of the plates and VIN numbers checked out. At that point, Wood testified he intended to write appellant a citation for failure to contain the equipment in the vehicle because the motorcycle did not fit in the truck properly. However, during the time Wood ran his checks, appellant had been speaking with one of the auto theft unit detectives and it was decided appellant would be driven downtown by Wood to speak with the detectives at the police station. According to Wood, appellant was not in Wood's patrol car during appellant's conversation with the detectives:

> Q: All right. When you handed — when you handed Mr. Marsh his driver's license and insurance back, where exactly was he?
> A: I believe he was still in the truck.
> Q: All right. So at that point you told him he was free to go, correct?
> A: No.
> Q: You didn't tell him he was free to go?
> A: No.
> Q: Why not?
> A: He already made arrangements to do something else.
> Q: Okay. How would you know that — I mean, I just want to make sure. You're in the car, running your check, running all your stuff, Mr. Marsh supposedly is talking to SAPD, you are not involved in the conversation, you didn't help them, they didn't help you just like you testified, how would you know that arrangements were made?
> A: When I walked back up, that's what I was told. Mr. Marsh was going to go downtown and talk to another city officer, and they asked me if I would transport him.
> Q: So who had him get out of his truck?
> A: I don't remember, sir.
> Q: You don't remember?
> A: No I don't remember.
> Q: Who put him in the back of your car?
> A: He came to the back of the car with me. I don't remember if he was standing next to his truck, he was leaning on the tailgate while he was talking to that city detective. I don't know. All I can tell you is he came to the back of the car with me because I put him in the back of the car.

Wood stated appellant was placed in handcuffs during the ride because it was "against policy and procedure" that a person be in the back seat of the patrol car without handcuffs on. After he arrived downtown Wood testified appellant's handcuffs were removed as soon as he got

out of the car. Wood testified appellant was not under arrest, but he never told appellant that he was free to go whenever he wanted. After dropping him off at the station, Wood had no further contact with appellant.

Detective Maurice, an officer with the auto theft unit, testified his contact with appellant began after his partner, Detective De Los Santos, made an arrest earlier in the day. Maurice stated that during the debriefing of the individual De Los Santos arrested, the individual informed De Los Santos that appellant was dealing stolen motorcycles. Maurice testified that he and another detective with the auto theft unit went to appellant's house to do a "knock-and-talk." He testified they "were going to basically knock and talk, and ask him for consent" to search the premises. When the detective noticed there was a large yard with a lot of motorcycles, they called for more officers and waited for them to arrive before knocking on the door.[1] While the detectives were waiting, one of them noticed appellant leaving the house in a truck with a motorcycle in the back.

Maurice testified he arrived on the scene where Wood had stopped appellant for the potential safety violation after Wood radioed he had made the stop. Maurice testified that he recalled having a conversation about the consent to search with appellant and both he and appellant were standing "probably outside of [appellant's] vehicle." At the motion to suppress hearing, appellant's trial counsel questioned Maurice regarding his conversation with appellant:

> A: The conversation basically went — we asked him — we told him that we had — we made an arrest, we received information that there was possibly some — he was dealing with stolen motorcycles. He denied it. I asked him if it would be okay for consent for us to go look onto his property and to look at these stolen motorcycles in which he agreed and gave us consent. I went back to my vehicle, I got a consent to search form — written consent SAPD form for consent, and he signed the consent.
> Q: And did he agree to do anything else?

---

[1] Maurice also testified they wanted a "uniformed presence" there as well because he and the other officer were in plain clothes.

A: Yes. He agreed to — asked then if he would go down to our office, at the auto theft office on San Saba and basically talk to the head detective about the incident — this incident — you know, the possibility — the motorcycles.

Q: And so did you then have him transported there to —

A: Yes, he was transported — he was transported — I believe by the county officer that stopped him.

As to appellant's location during this conversation, Maurice testified:

Q: All right. Now, once he was stopped and you made — you made your way over there, you said you think that he was outside the vehicle?

A: Yes, sir, I think he was. I believe he was. I don't know for sure.

Q: You're pretty sure he was outside the vehicle?

A: I'm pretty sure. Yes, sir.

Q: All right. He wasn't in the back of the police officer's car handcuffed, waiting for you?

A: No, sir.

Appellant also testified at the hearing on the motion to suppress. According to appellant, he was handcuffed in the back of Wood's patrol car before Maurice arrived. He stated that while he was seated in the patrol car, Maurice and other officers starting "taking apart" the motorcycle in the back of his truck so they could see the engine number and determine if it was stolen. Appellant testified he watched the officers take apart the motorcycle for approximately fifteen to twenty minutes until Maurice approached appellant and told him "everything is good with that motorcycle but we — we want to search your property. You need to let us search your property." Appellant stated he did not have anything to hide, so he agreed but "[he] was under duress, and [his] hands behind [his] back and pushing in [his] back and handcuffs too tight." Appellant testified: "I was under arrest, in my opinion." Appellant was asked how he signed the consent form in handcuffs:

Q: Mr. Marsh, you admitted that you did sign something while you were in the police car?

A: Yes.

Q: Now, how did you sign it with you name? Did they release the handcuffs for you to sign?

A: I think they did. And then they put them right back on —

Appellant further stated the officers did not ask him if he was willing to go downtown to talk, but instead sent him downtown while they went to his house.

In his only issue on appeal, appellant argues the trial court erred in denying his motion to suppress because his consent to search was invalid. Specifically, he asserts his consent to search was obtained incident to an illegal arrest when he was detained without probable cause in violation of the U.S. Constitution.

## WAIVER

We first address the State's argument that appellant waived his right to appeal when he entered into a negotiated plea bargain. Texas Rule of Appellate Procedure 25.2 provides: "In a plea bargain case—that is, a case in which a defendant's plea was guilty or nolo contendere and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant—a defendant may appeal only: (A) those matters that were raised by written motion filed and ruled on before trial, or (B) after getting the trial court's permission to appeal." TEX. R. APP. P. 25.2(a)(2). The State asserts that although appellant raised his motions to suppress pre-trial and secured rulings on those motions before entering his plea, he waived his right to appeal any part of his proceedings as part of his plea bargain. We disagree with the State for two reasons.

First, the trial court's original "Certification of Defendant's Right to Appeal," signed on January 26, 2012, stated appellant's case was "a plea-bargain case, and the defendant has NO right of appeal." On February 24, 2012, appellant filed his Motion to Amend the Trial Court's Certification of Defendant's Right to Appeal with the trial court. The State filed no response. The trial court did not rule on appellant's motion and appellant filed a notice of appeal with this court on April 26, 2012. Appellant attached the original trial court's certification that stated his case was "a plea-bargain case, and the defendant has NO right of appeal," but indicated he intended to appeal the denial of his pre-trial motions. The State filed no response. In an order issued on June 26, 2012, this court ordered the

trial court to correct the defective certification because appellant had the right to appeal those matters raised by written motion filed and ruled on before trial pursuant to Rule 25.2(a)(2)(A). The State did not object to our order. The trial court entered an amended "Certification of Defendant's Right to Appeal" on July 17, 2012, stating appellant's case was "a plea-bargain case, but matters were raised by written motion filed and ruled on before trial and not withdrawn or waived, and the defendant has the right of appeal." Underneath this statement, the trial court made a handwritten note stating "motion to suppress heard on this case." The State did not object to the trial court's entry of an amended certification.

Subsection (f) of Texas Rule of Appellate Procedure 25.2 provides: "An amended . . . trial court's certification of the defendant's right of appeal . . . may be filed in the appellate court . . . . The amended . . . certification is subject to being struck for cause on the motion of any party affected by the amended notice or certification. After the appealing party's brief is filed, the notice or certification may be amended only on leave of the appellate court and on such terms as the court may prescribe." TEX. R. APP. P. 25.2(f). Here, the State did not file a motion to strike the trial court's entry of an amended certification and, as evidenced above, raises its complaint for the first time in its appellate brief.

Second, the Rules of Appellate Procedure clearly indicate that a defendant has a right to appeal those matters raised by written motion and ruled on before the trial court prior to entering into a plea bargain. *See* TEX. R. APP. P. 25.2(a)(2)(A). The State, however, contends appellant "clearly and distinctly waived his right to appeal" and he acknowledged to the trial court that he understood he waived his right to appeal as part of his plea bargain. Our review of the record does not support the State's argument that appellant specifically waived his right under Rule 25.2(a)(2)(A) to appeal the denial of his pre-trial motion to suppress as part of the plea bargain agreement. Accordingly, we conclude appellant has not waived his right to appeal the denial of his motion to suppress.

**DENIAL OF MOTION TO SUPPRESS**

We review a trial court's denial of a motion to suppress under an abuse of discretion standard. *Moore v. State*, 55 S.W.3d 652, 655 (Tex. App.—San Antonio 2001, no pet.). Factual determinations are viewed in the light most favorable to the trial court's ruling and we give almost total deference to findings of historical fact that are supported by the record, "especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (en banc). "However, when the resolution of the factual issue does not turn upon an evaluation of credibility or demeanor, we review the trial court's determination of the applicable law, as well as its application of the appropriate law to the facts it has found, de novo." *Moore*, 55 S.W.3d at 655.

We must first decide whether the seizure of appellant was an "investigative detention or a custodial arrest, because the nature of the seizure determines the constitutional parameters which apply to determine its legality." *Id.* "An investigative detention, to be constitutionally valid, may be founded upon a reasonable, articulable suspicion that the person detained is connected with criminal activity . . . but an arrest, to pass constitutional muster, must be supported by the greater conclusiveness of probable cause to believe that a particular person has committed or is committing an offense." *Amores v. State*, 816 S.W.2d 407, 411 (Tex. Crim. App. 1991) (en banc) (internal citations omitted). Appellant does not challenge Wood's reason for pulling him over and concedes he was "initially detained legally." Instead, his argument is that his detention went too far, resulting in an "illegal arrest."

The following non-exclusive factors are used to determine whether a seizure has elevated into a custodial arrest: (1) the basis for the encounter; (2) whether the encounter was consensual; (3) the duration of the encounter; (4) investigative methods used to confirm suspicions; (5) an officer's statement that the suspect is or is not free to leave; (6) whether weapons are displayed or other force is

used; (7) the number and demeanor of the officers present at the seizure; (8) the extent of the suspect's restraint; (9) whether the suspect was transported to another location against his will; and (10) whether the suspect was free to leave. *Moore*, 55 S.W.3d at 656.

Here, the basis for the encounter, initially, was for a potential safety violation. Wood testified he could not tell if the motorcycle was properly secured in the back of appellant's truck. Appellant pulled his truck over when Wood signaled for him to stop and concedes he was "originally detained legally," pursuant to a valid stop. According to appellant's testimony, it appears the stop was approximately thirty minutes in duration. However, he was then taken to the police station and the record is not clear on how long he was there with the other detectives.

Wood testified as part of his investigation he ran the license plate on the motorcycle and matched it to the VIN to make sure it was not stolen. Wood also testified he checked to make sure there were no warrants out for appellant's arrest. Maurice testified when he arrived on scene he had a conversation with appellant and told him they had received information from an informant that appellant was possibly dealing stolen motorcycles. Maurice stated appellant denied the accusation, and Maurice then asked appellant if he would give consent to search his property and look at the motorcycles. Appellant agreed and signed the consent form.

Both officers testified they did not tell appellant he was or was not free to leave. There was no testimony that any weapon or force was used during appellant's stop. Appellant testified that there were four officers on the scene after Maurice showed up with two other officers.[2] Initially, appellant was not restrained when Wood conducted his investigation of the motorcycle. However, both officers concede appellant, at some point during the encounter, was placed in handcuffs in the back of Wood's patrol car and transported to the police station. Both officers stated he was not under arrest, and Wood

---

[2] Maurice's testimony seemed to indicate there was only one other officer with him on scene. However, he never definitively states this. Wood testified he recalled only one officer from auto theft was on the scene.

testified he was only placed in handcuffs pursuant to a safety policy that no one may be in the back seat of the patrol car without handcuffs on.

Appellant was transported to the police station and testified the officers did not ask him if he was willing to go downtown. Both officers testified that appellant was free to leave if he wanted to. Maurice testified that appellant never asked to drive himself and "[i]f he would have asked if he wanted to drive by himself, he was more than welcomed to drive by himself." Maurice also stated, "[w]e actually had people ask to drive themselves."

Based on an analysis of the *Moore* factors, we conclude appellant's detention elevated to a custodial arrest at the point when he was handcuffed and put in the back seat of the patrol car to be taken to the police station. Although the basis for the encounter was initially for a potential safety violation and the encounter, in general, was relatively short in duration, neither officer informed appellant he could leave the scene, the extent of appellant's restraint was high (handcuffs), and he was taken away from the scene to the police station in a police vehicle. Having determined appellant was arrested we would ordinarily next determine whether his warrantless arrest was legal. *See Amores*, 816 S.W.2d at 411 (arrest must be supported by probable cause). However, in this case, because both officers agreed there was no probable cause to place appellant under arrest we conclude the arrest was illegal. We next consider whether appellant's consent was sufficiently attenuated from the "taint inherent in the illegality" of his arrest. S*ee Brick v. State*, 738 S.W.2d 676, 681 (Tex. Crim. App. 1987) (en banc).

In *Brick v. State*, the Court of Criminal Appeals held that before it can be determined that evidence derived from a warrantless but consensual search following an illegal arrest is admissible it must be determined that not only was consent voluntarily rendered, but also that "the taint otherwise inherent in the illegality of the arrest has dissipated" by the time consent is given. *Brick*, 738 S.W.2d at 681; *see Stone v. State*, 279 S.W.3d 688, 693 (Tex. App.—Amarillo 2006, pet ref'd). It follows that

if the consent occurs *before* the "illegality of the arrest," there can be no "taint otherwise inherent."[3] *See Brick*, 738 S.W.2d at 681. Maurice testified appellant gave the consent to search before he was handcuffed in the patrol car, the point at which we have concluded his detention elevated to an illegal arrest. Maurice testified he had a conversation with appellant about the informant's claims regarding stolen motorcycles and requested consent to search appellant's house while appellant was outside of his own vehicle and before he was handcuffed in the patrol car. Wood's testimony corroborated Maurice's statements that appellant was not in the patrol car at the time appellant gave his consent to search and his consent to go to the police station. Because factual determinations based on an evaluation of credibility are viewed in the light most favorable to the trial court's ruling, we must credit the testimony of Maurice and Wood over appellant who said he did not give consent until after he was handcuffed in the patrol car. *See Guzman v. State*, 955 S.W.2d at 89. Given the testimony of Maurice and Wood, the trial court could have determined appellant consented to the search prior to the time of appellant's illegal arrest.

## CONCLUSION

Although we determine the investigative detention of appellant rose to the level of an illegal arrest, we conclude the evidence supports that appellant gave his consent to search before the arrest became illegal. Therefore, we conclude the trial court did not abuse it's discretion in finding the

---

[3] The U.S. Supreme Court has used a "totality of the circumstances" approach to determining voluntariness. *See Brown v. Illinois*, 422 U.S. 590, 604 (1975) (indicating voluntariness must be "answered on the facts of each case" and "[n]o single fact is dispositive"). In determining whether a confession given as a result of an illegal arrest is voluntary, the non-exclusive factors to be considered include the "temporal proximity of the arrest and the confession, the presence of intervening circumstances . . . and, particularly, the purpose and flagrancy of the official misconduct . . . ." *Id.* at 603–04 (internal citations omitted). We believe giving consent before an illegal arrest occurs also indicates the consent was "voluntarily rendered."

consent was valid and not a product of a violation of appellant's rights and denying his motion to suppress accordingly. The trial court's judgment is affirmed.

Sandee Bryan Marion, Justice

Publish