## IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 44479

| | | |
|---|---|---|
| In the Interest of: JOHN DOE (2016-39) | ) | |
| | ) | |
| STATE OF IDAHO, | ) | 2017 Opinion No. 63 |
| | ) | |
| Petitioner-Appellant, | ) | Filed: November 20, 2017 |
| | ) | |
| v. | ) | Karel A. Lehrman, Clerk |
| | ) | |
| JOHN DOE (2016-39), | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Gerald F. Schroeder, Senior District Judge. Hon. William Harrigfeld, Magistrate.

Order of the district court affirming magistrate's order granting motion to suppress, affirmed.

Hon. Lawrence G. Wasden, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for appellant.

Dowdy Law Office; J. Scott Dowdy, Kuna, for respondent.

---

GRATTON, Chief Judge

The State appeals from the district court's appellate decision affirming the magistrate court's order granting John Doe's motion to suppress statements Doe made to detectives during the course of an investigation.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts were addressed in the magistrate's memorandum decision and order:

On August 28, 2014, Detective Joe McCarthy (McCarthy) of BPD, interviewed [Doe] in connection with an investigation into potential lewd conduct with a minor that occurred on August 23, 2014. McCarthy interviewed [Doe] in his office at [the junior high school]. [Doe] was 14 years old at the time and a

1

freshman at [the junior high school]. It is unclear from the report if the office doors were closed, but [Doe] was alone in the officer [sic] with McCarthy. McCarthy never indicated to [Doe] that he did not have to speak with him, nor that [Doe] was free to leave at any time that he desired. In his report, McCarthy indicates at the outset that he did not Mirandize [Doe] because he believed he was a potential witness rather than a suspect in the alleged incident. McCarthy indicated in his report that a portion of the interview with [Doe] was recorded; however, discovery materials received by counseling [sic] did not include any audio of McCarthy's interview. Due to the lack of the actual recording, it is impossible to determine neither the length of time that [Doe] was interviewed nor the exact nature of the questioning.

McCarthy asked [Doe] about the relationship between the alleged victim [] and [witness] due to the fact that [witness] was a suspect in the lewd conduct incident. During questioning, [Doe] indicated that [victim] "came onto" him by crawling in his lap and wanted to make out with him. McCarthy indicates that [Doe] was a witness and so he "continued to ask about [victim's] behavior believing that he might talk about [victim] and [witness]." [Doe] proceeded to tell McCarthy that he witnessed [victim] without her bra and shirt and that [victim] again approached him. McCarthy asked [Doe] what he did and if he reciprocated [victim]'s advances "believing that if he talked about actions he might talk about [witness]. McCarthy states that [Doe] indicated that he kissed [victim] and that she gave him a "hand job" while gesturing that he touched her chest. [Doe] then added that [victim] gave him a "blow job" that lasted 3 to 5 seconds.

At this point, McCarthy indicates that he stepped out of the room to call Detective Angie Munson (Munson) and tell her about [Doe]'s disclosures. McCarthy reports that he "returned to his office a short time later and [Doe] told me that he had vaginal intercourse with [victim] for about 5 seconds when he stopped because he noticed that she was not responding to him when he spoke her." McCarthy then states that [Doe] was sent back to class.

After McCarthy's interview, it was determined that the crime took place outside Boise city limits and Detective Munson turned the investigation over to Detective Matthew Buie (Buie) of the ACSO. During a briefing on August 28, 2014, where a number of detectives were present, Munson informed Buie of the status of the investigation to that point. Munson indicated that [Doe] had admitted to having sex with [victim] during an interview with McCarthy. McCarthy arrived late to the briefing and informed Buie of the details of [Doe]'s interview. McCarthy indicated "that he didn't realize that [Doe] was a suspect during his interview with him and did not provide him with Miranda rights." McCarthy further explained that he believed that [Doe] was only a possible witness "until [Doe] admitted to having sexual contact with [victim]."

Following the briefing, Buie interviewed [witness] on August 28, 2014 at his house in an attempt to get more information about [Doe]'s sexual contact with [victim]. At 18:31 Buie walked into the garage with [witness] and asked him if anyone had sex with [victim]. [Witness] responded that no one was ever alone with [victim] in the garage. Buie told [witness] that he knew [Doe] had sex with [victim]. [Witness] then indicated that [victim] was "touchy touchy" with [Doe].

2

Buie then met with [witness]'s mother and got permission to interview him in the garage. At 18:39 Buie again interviewed [witness] in the garage and asked [witness] for more detailed information about what happened between [victim] and [Doe]. [Witness] stated that [victim] was trying to get [Doe] to do "stuff." Buie wanted to clarify what "stuff" meant and [witness] indicated that it meant "sex."

On August 29, 2014, Buie went to [the junior high school] to interview [Doe] again. They met in a conference room at the school with no one else present. Buie told [Doe] that he did not have to speak with him and he read [Doe] his Miranda rights. [Doe] indicated that he wanted his grandmother present during the interview but she did not answer her phone. [Doe] agreed to speak with Buie without his grandmother present. Buie then asked [Doe] to tell him what happened and allowed [Doe] to state his version of events without interruption or further questions. [Doe] indicated that he and [victim] went into the garage and started to do "stuff." When [Doe] realized she was really drunk, he "stopped doing stuff with her." [Doe] had never indicated to that point what "stuff" he and [victim] were doing. Buie wanted to clarify the events [Doe] described because [Doe] was "talking really fast." Buie asked a few follow up questions about when [victim] arrived and how much alcohol she had consumed. Buie then asked [Doe] how long after she started drinking that he ended up in the garage with [victim]. [Doe] stated that it was about 20 minutes later. Buie responded by asking "is that when you had sex with her?" [Doe] responded in the affirmative. Buie continued to question [Doe], leading him in to the acts that Buie was already aware of from McCarthy's interview. Buie asked if [victim] rubbed [Doe]'s penis and he stated yes. Buie then asked if [Doe] put his penis into [victim]'s vagina and he stated yes. Buie asked how long his penis was inside [victim]'s vagina to which [Doe] responded 5 seconds. Buie responded with disbelief stating: "now I'm a guy and I've had sex and for me to leave, to do that for 5 or 10 seconds is probably darn near impossible." Buie asked [Doe] if he had ejaculated and [Doe] stated he did not and that he had a condom. Sometime later in the interview, Buie reiterated [Doe]'s statement about the duration of the event by stating "the sex only lasts 10 seconds? You've got some serious self-control, if that is the case." Eventually Buie ended the interview.

Doe was charged with lewd and lascivious conduct with a minor, Idaho Code § 18-1508. Doe moved to suppress the statements he made during both of the interviews with the detectives. Following a hearing, the magistrate entered an order granting Doe's motion to suppress. The district court affirmed. The State timely appeals.

## II.

## STANDARD OF REVIEW

For an appeal from the district court, sitting in its appellate capacity over a case from the magistrate division, this Court's standard of review is the same as expressed by the Idaho Supreme Court. The Supreme Court reviews the magistrate record to determine whether there is

3

substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. *State v. Korn*, 148 Idaho 413, 415, 224 P.3d 480, 482 (2009). If those findings are so supported and the conclusions follow therefrom, and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure. *Id*. Thus, the appellate courts do not review the decision of the magistrate. *State v. Trusdall*, 155 Idaho 965, 968, 318 P.3d 955, 958 (Ct. App. 2014). Rather, we are procedurally bound to affirm or reverse the decision of the district court. *Id*.

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

## III.

## ANALYSIS

The State argues that the district court incorrectly concluded that Doe's statements in the interview with the Ada County Sheriff's Office (ACSO) detective were inadmissible as "fruit of the poisonous tree" of the initial interview. On the motion to suppress, the magistrate first determined that *Miranda*[1] warnings should have been given in the first interview, and therefore suppressed the statements from that interview. In doing so, the magistrate noted the facts set forth above, and in addition, noted that the BPD officer was in uniform, there was no indication Doe had any prior experience with law enforcement, and was without adult support. The magistrate also noted that the officer asked Doe if he and the victim "hooked up," to which Doe responded in the affirmative, leading the magistrate to determine that at that point Doe was a suspect and should have been *Mirandized*. The district court, although quoting the magistrate's factual findings, turned to the motion to suppress hearing transcript to make numerous additional factual findings. Ultimately, however, the district court held that under the totality of the

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

4

circumstances, the fourteen-year-old juvenile would have reasonably believed that his submission to questioning was compulsory and that the setting was custodial, requiring *Miranda* warnings. On appeal, the State does not directly challenge the determination that *Miranda* warnings should have been given incident to the first interview and that suppression of statements therein was appropriate.

Instead, in this appeal, the State contends that the magistrate and district court erred in determining that statements made in the second interview should be suppressed as "fruit of the poisonous tree" of the first interview. In holding that the second interview was fruit of the poisonous tree, the magistrate made no additional factual findings, but after citing to *State v. Radford*, 134 Idaho 187, 194, 998 P.2d 80, 87 (2000), stated: "In questioning the juvenile, Detective Buie used the information he obtained from Detective McCarthy. Therefore, Detective Buie's interview was sufficiently tainted to give rise to the doctrine of 'fruit of the poisonous tree.'" The district court again turned to the motion to suppress hearing transcript to make numerous additional findings of fact. Ultimately, the district court also looked to *Radford*, but quoted as follows:

> "While the officers' knowledge of [Doe's] compelled statement may have initially led them to interview him, the statements he made to the officers during the [subsequent] interview . . . were the result of an intervening independent act of free will." *Radford*, 134 Idaho at 194, 998 P.2d at 87 (also noting "after an accused has once [let] the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.").
> There is a gap in the analysis as to whether the taint of the first suppressed statements was sufficiently purged by the advice of rights given by Detective Buie in the second interview or whether that interview was an exploitation of the earlier interview without adequate steps to purge the taint. *Radford*, 134 Idaho at 193, 998 P.2d at 86. At his age, the juvenile might well assume that there was no point in exercising his rights since he had already told a police officer what the girl had done and what he did in response. While that analysis is not articulated by the magistrate, it is apparent he made such an analysis to reach the decision. The issue was presented to the magistrate by the prosecution. Clearly the second interview exploited the information obtained in the first interview. The record is sufficient to reach the conclusion that adequate steps were not taken to purge the taint.

In *Radford*, incriminating statements involving an uncharged crime were admitted by Radford in the course of a polygraph examination. Thereafter, officers used that compelled information in a second interview of Radford wherein incriminating statements were again made. Radford filed a motion to suppress the statements made to the officers in the second interview. Radford argued that the subsequent statements made to law enforcement were the "fruit of the poisonous tree" of the prior compelled statements. The Idaho Supreme Court determined that Radford's statements to law enforcement were not "fruit" of the earlier compelled statement given in the polygraph examination:

> The United States Supreme Court has held the Fifth Amendment protects against the use of a witness's compelled answers and "evidence derived therefrom" in any subsequent criminal trial. *Lefkowitz v. Turley*, 414 U.S. 70, 78 (1973). Radford argues the June 4th statements are forbidden fruit of the compelled statements because the officers never would have questioned Radford about the crime had they not been informed of the substance of his compelled statements. However, the United States Supreme Court has stated that the test of whether subsequent evidence constitutes "fruit of the poisonous tree" is more than just a "but for" test. *Wong Sun v. United States*, 371 U.S. 471 (1963). In *Wong Sun*, the Court stated that:
>> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."
>
> *Id.* at 487-88. The question in the present case is not whether the officers would not have obtained Radford's June 4th statements "but for" their knowledge of his compelled statement, but rather whether the June 4th statements were sufficiently an act of free will to purge the primary taint of the compelled statement.

*Radford*, 134 Idaho at 193-94, 998 P.2d at 86-87.

Thus, under *Wong Sun*, the question is whether the evidence obtained in the second interview was obtained by exploitation of the prior illegality or instead by means sufficiently distinguishable to be purged of the primary taint. In *Brown v. Illinois*, 422 U.S. 590 (1975), the Court held that in considering whether a confession was the product of a free will under *Wong Sun*, the administration of *Miranda* warnings is an important factor but, by themselves, could not be assumed to attenuate the taint of an unconstitutional arrest. *Brown*, 422 U.S. at 602-03. The *Brown* Court noted that other factors to be considered include the temporal proximity of the

6

police misconduct and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id*. at 603-04.

As noted, the district court concluded that the ACSO detective's interview with Doe exploited the BPD detective's earlier interview with Doe, and that adequate steps were not taken to purge the taint. The State relies on *Oregon v. Elstad*, 470 U.S. 298, 300-18 (1985) in support of its assertion that the district court erred because the BPD detective's failure to give *Miranda* warnings at the initial interview does not taint future voluntary and *Mirandized* statements. The *Elstad* Court held that a breach of *Miranda* does not necessarily mean a Fifth Amendment violation has occurred. Accordingly, "errors [ ] made by law enforcement officers in administering the prophylactic *Miranda* procedures . . . should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself." *Elstad*, 470 U.S. at 309. The United States Supreme Court reasoned that:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id*.

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id*. at 314.

> [T]here is no warrant for presuming coercive effect [with respect to the post-*Miranda* statement] where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary.

*Id*. at 318. The Court concluded that "[w]e hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318.

7

The State argues that the mere failure to administer *Miranda* warnings in the first interview does not render the subsequent warned and voluntary statements inadmissible. The State contends that under *Elstad* suppression is not required where, as here, there was but a mere procedural error in failing to administer *Miranda* warnings. Further, the State asserts that in this case the simple failure to administer *Miranda* warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's free will or deliberately coercive or improper tactics in obtaining the initial statement, does not require suppression in accordance with *Elstad*. Finally, the State contends that Doe's initial statements were voluntary and because Doe did not raise the issue of voluntariness below, the lower courts did not address it and Doe cannot now make an argument that his initial statements to the BPD detective were involuntary.

As an initial matter, we cannot agree that the failure to administer *Miranda* warnings in the first interview was a "mere," "simple," or "procedural" error. The magistrate noted that at the outset of the initial interview, the detective indicated that he believed that Doe was a potential witness not a suspect and so did not administer *Miranda* warnings. However, the magistrate appropriately determined that Doe was considered a suspect when the officer asked a leading question about whether Doe and the victim "hooked up." While we agree, it is apparent from the magistrate's findings that the officer did or should have known to *Mirandize* Doe much earlier in the conversation, before incriminating statements were made, when Doe indicated being together with the victim on the night in question, and that Doe stated the victim wanted to make out and then approached him without a shirt or bra. Yet, the detective continued questioning until incriminating statements were made. After obtaining incriminating statements, the detective left the room and called another detective to relay the disclosures. More surprisingly, after the phone call to the other detective, the detective did not *Mirandize* the fourteen-year-old student, but returned to the room and obtained more incriminating statements. These circumstances were either calculated to undermine the suspect's free will or crossed the line into improper tactics.[2]

---

[2]     The State acknowledges that in *Missouri v. Seibert*, 542 U.S. 600, 604-616 (2004), the Court held that an unwarned but voluntary statement could still render a future statement inadmissible if the detective made a conscious decision to employ a "question-first" strategy to withhold *Miranda* warnings for the purpose of soliciting incriminating statements. The State argues that in this case there is no indication such a strategy was employed. However, it is difficult to conceive just what the strategy was after receiving incriminating statements, taking a

Next we turn to the question of whether the evidence obtained in the second interview was obtained by exploitation of that illegality. It was. This situation went beyond the notion of simply "but for" the earlier disclosures the subsequent disclosures would not have been obtained. Certainly, prior to the second interview, the detective was advised of the details of the initial disclosures. One day later, the second detective *Mirandized* and questioned Doe. The magistrate noted that Doe went only so far as to say that he and the victim started to do "stuff" and when he realized she was drunk, he "stopped doing stuff with her." He did not identify what "stuff" meant. After asking about drinking, the detective asked "is that when you had sex with her?" It was quite clear that the detective knew of the disclosures made to another detective just the day before. This is further evidenced by the magistrate's finding that "Buie continued to question [Doe], leading him in to the acts that Buie was already aware of from McCarthy's interview." The circumstances here matter in the exploitation analysis. This is a fourteen year old, unaccompanied by a supportive adult, with no indication of any prior experience with law enforcement, being questioned by a detective one day after making disclosures in such a manner as to be clear that the detective was aware of the prior disclosures. It seems no stretch, as the district court concluded, that "At his age the juvenile might well assume that there was no point in exercising his rights since he had already told a police officer what the girl had done and what he did in response."

Finally, we turn to the factors outlined in *Brown*, including the temporal proximity of the police misconduct and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct, to determine if the interviews are sufficiently distinguishable so as to be purged of the primary taint. As to temporal proximity, the interviews were a mere day apart. The only material intervening circumstance is that the second interview was conducted by a second detective who, however, was fully cognizant of the initial disclosures. Regarding misconduct, as noted above, the failure to *Mirandize* Doe at *any* point in the initial interview is at best troubling and at worst calculated. The evidence to which instant objection is made was obtained in a manner insufficiently distinguishable of the initial illegality to be purged of the primary taint.

---

break to call another officer, and then returning, without *Miranda* warnings, to obtain yet more incriminating statements.

The district court did not err in finding that the second interview exploited the information obtained in the first interview. The record is sufficient to reach the conclusion that adequate steps were not taken to purge the taint.

## IV.

## CONCLUSION

The magistrate's decision is supported by the applicable law. The district court's order affirming the magistrate's decision to grant Doe's motion to suppress is affirmed.

Judge GUTIERREZ and Judge HUSKEY **CONCUR**.